**Opinion issued August 9, 2018**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00345-CV

————————————

**REBECCA V. SAVOY AND THERESA SAVOY, Appellants**

**V.**

**NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3, Appellee**

---

**On Appeal from the County Civil Court at Law No. 2**
**Harris County, Texas**
**Trial Court Case No. 1076548**

---

# O P I N I O N

This is an appeal from a final judgment in favor of National Collegiate

Student Loan Trust 2005-3 in its suit against Rebecca and Theresa Savoy for

breach of a student loan agreement and personal guaranty.[1] In three issues, the Savoys contend that (1) the trial court abused its discretion in admitting the Trust's exhibits under the business-records exception to the hearsay rule, (2) there is legally and factually insufficient evidence to support the trial court's judgment, and (3) the Trust did not have standing to sue because the loan's other guarantor, The Education Resources Institute, Inc., assumed and paid off the debt after the Savoys defaulted. We suggest a remittitur of damages. Conditioned on that suggestion, we affirm the trial court's judgment.

## Background

In August 2005, Rebecca Savoy, as borrower, and Theresa Savoy, as cosignor, took out a student loan from JPMorgan Chase Bank, N.A. to finance Rebecca's education at the University of Houston. Over ten years later, in April

---

[1] This appeal is one of several recent appeals involving Delaware statutory trusts that have acquired student loan debt and subsequently asserted claims against defaulting borrowers and guarantors. *See, e.g.*, *Mock v. Nat'l Collegiate Student Loan Tr. 2007-4*, No. 01-17-00216-CV, 2018 WL 3352913 (Tex. App.—Houston [1st Dist.] July 10, 2018, no pet. h.) (mem. op.); *Foster v. Nat'l Collegiate Student Loan Tr. 2007-4*, No. 01-17-00253-CV, 2018 WL 1095760 (Tex. App.—Houston [1st Dist.] Mar. 1, 2018, no pet.) (mem. op.). Although the cases involve different borrowers and different trusts, the lawyers are the same and the issues are similar.

2016, the Savoys were sued by a Delaware statutory trust,[2] National Collegiate Student Loan Trust 2005-3, for defaulting on the loan.[3]

The Trust alleged that it acquired the note from JPMorgan Chase before the Savoys' first payment date, when the loan was still in good standing. The Trust further alleged that, after the loan's deferral period, the Savoys failed to make payments as agreed, causing a default. The Trust then sent the Savoys a letter demanding payment in full, but the Savoys failed to pay the note. The Trust asserted claims for breach of contract and breach of personal guaranty, seeking damages of $20,492.05 for the unpaid balance and $2,004.15 for accrued and unpaid interest.

The case was tried to the bench. The Trust did not call any live witnesses. Instead, it offered into evidence the affidavit of Alicia L. Holiday, a legal case manager for the Trust's loan subservicer, Transworld Systems, Inc., and seven attached exhibits.

The first exhibit was a Subservicer Confirmation letter, which showed that TSI is a subservicer for the Trust and the custodian of records for all student loan

---

[2] *See* DEL. CODE tit. 12, §§ 3801–26.

[3] Unlike common law trusts, statutory trusts may sue and be sued. *See* TEX. BUS. & COM. CODE § 9.102 cmt. 11 (statutory trust is juridical entity that may sue and be sued); *cf. Ray Malooly Tr. v. Juhl*, 186 S.W.3d 568, 570 (Tex. 2006) (stating general rule that suit against common law trust must be brought against trustee).

3

accounts owned by the Trust. The second exhibit consisted of two documents relating to the origination of the loan: (1) a "Loan Request/Credit Agreement" and (2) a "Note Disclosure Statement." The third exhibit consisted of three documents relating to JPMorgan Chase's assignment of the loan through an intermediary to the Trust: (1) a "Pool Supplement," dated October 12, 2005, (2) a redacted copy of Schedule 1 to the Pool Supplement, and (3) a "Deposit and Sale Agreement," also dated October 12, 2005. The fourth, fifth, sixth, and seventh exhibits consisted of four documents relating to the loan's repayment history: (1) a "Loan Financial Activity" Report, (2) a "Deferment/Forbearance" Summary, (3) a "Repayment Schedule," and (4) a "Loan Payment History Report."

The Savoys made numerous written and oral objections to Holiday's affidavit and the attached exhibits. The trial court overruled the Savoys' objections and admitted the seven exhibits into evidence under the business-records exception to the hearsay rule. The trial court rendered judgment for the Trust on both its claims, awarding it damages in the amount of $20,492.05, plus costs and interest. The Savoys appeal.

**Admissibility of Evidence**

In their first issue, the Savoys contend that the trial court abused its discretion in admitting the Pool Supplement, Pool Supplement Schedule, Deposit and Sale Agreement, Loan Financial Activity Report, Deferment/Forbearance

4

Summary, and Repayment Schedule into evidence under the business-records exception to the hearsay rule. The Savoys contend that none of the documents satisfy the requirements of the business-records exception. And they further contend that three of the documents—the Pool Supplement, Pool Supplement Schedule, and Deposit and Sale Agreement—were not properly authenticated.

## A. Standard of review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Simien v. Unifund CCR Partners*, 321 S.W.3d 235, 239 (Tex. App.—Houston [1st Dist.] 2010, no pet.). A trial court abuses its discretion when it acts without reference to any guiding rules and principles. *Id.* We must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Id.*

## B. Whether documents meet requirements of Rule 803(6) to qualify as business records

Hearsay is an out-of-court statement offered into evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is inadmissible unless a statute or rule provides otherwise. TEX. R. EVID. 802. The proponent of hearsay has the burden to show that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Simien*, 321 S.W.3d at 240.

Rule 803 establishes various exceptions to the hearsay rule, including an exception for certain business records. Under the business-records exception, a record of an act, event, condition, or opinion is not excluded by the hearsay rule if:

5

(A)   the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B)   the record was kept in the course of a regularly conducted business activity;

(C)   making the record was a regular practice of that activity;

(D)   all these conditions are shown by the testimony of the custodian or another qualified witness, or by an affidavit or unsworn declaration that complies with Rule 902(10); and

(E)   the opponent fails to demonstrate that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

TEX. R. EVID. 803(6).

"A document authored or created by a third party may be admissible as business records of a different business if: (a) the document is incorporated and kept in the course of the testifying witness's business; (b) that business typically relies upon the accuracy of the contents of the document; and (c) the circumstances otherwise indicate the trustworthiness of the document." *Simien*, 321 S.W.3d at 240–41.

In her affidavit, Holiday testified that TSI is the Trust's loan subservicer and the designated custodian of records for the Savoys' educational loan; that she is employed by TSI and authorized by the Trust to make the representations in her affidavit and to testify about the Savoys' educational loan; and that she has personal knowledge of the business records maintained by TSI as custodian of

6

records and the business records attached to her affidavit. *See* TEX. R. EVID. 903(6)(D). She stated that the records are created, compiled, and recorded as part of regularly conducted business activity at or near the time of the event and from information transmitted by a person with personal knowledge of the event and a business duty to report it, or from information transmitted by a person with personal knowledge of the accounts or events described within the business records. *See* TEX. R. EVID. 803(6)(A), (C). She further stated that the records are created, kept, maintained, and relied upon in the course of ordinary and regularly conducted business activity. *See* TEX. R. EVID. 803(6)(B). And she stated that it is TSI's regularly conducted business practice to incorporate prior loan records and documentation into TSI's business records and that she is familiar with the process by which TSI receives prior account records, including origination records from the time the loans are requested and the funds disbursed. *See Simien*, 321 S.W.3d at 240–41 (stating circumstances under which document authored or created by third party may be admissible as business record of different business).

Thus, Holiday's affidavit provided the testimony necessary to show that the attached business records comply with the general requirements of Rule 803(6). Nevertheless, the Savoys argue that the Pool Supplement, Deposit and Sale Agreement, Pool Supplement Schedule, Loan Financial Activity Report,

Deferment/Forbearance Summary, and Repayment Schedule did not qualify as business records because they were not trustworthy for various reasons.

### 1. Pool Supplement and Deposit and Sale Agreement

First, the Savoys argue that the Pool Supplement and Deposit and Sale Agreement did not qualify as the Trust's business records because they were retrieved from the SEC's online database, EDGAR. Assuming the Pool Supplement and Deposit and Sale Agreement were retrieved from EDGAR, these documents were nevertheless admissible as business records of the Trust because the Trust showed (a) the documents are incorporated and kept in the course of the Trust's business, (b) it typically relies upon the accuracy of the contents of these documents, and (c) the circumstances otherwise indicate that the documents are trustworthy. *Id.* Holiday averred that it is TSI's regularly conducted business practice to incorporate prior loan records and documentation into TSI's business records and that she is familiar with the process by which TSI receives prior account records. And if the Pool Supplement and Deposit and Sale Agreement came from EDGAR, then the circumstances indicate they are trustworthy. *See Williams Farms Produce Sales, Inc. v. R&G Produce Co.*, 443 S.W.3d 250, 259 (Tex. App.—Corpus Christi 2014, no pet.) (documents printed from government websites are self-authenticating).

The Savoys further argue that the Pool Supplement was inadmissible because the copy proffered by the Trust is missing its final, fifth page. But the Savoys themselves admit that the fifth page is simply a reference to the Pool Supplement Schedule—which the Trust did proffer in redacted form. We hold that the trial court did not abuse its discretion in admitting Pool Supplement and Deposit and Sale Agreement.

### 2. Pool Supplement Schedule

Next, the Savoys argue that the Pool Supplement Schedule did not qualify as the Trust's business record because it was not made contemporaneously, it is not a record of the Trust but rather the Trust's indenture trustee, and it is not the schedule referenced by the Pool Supplement attached to Holiday's affidavit, as it contains information relating to only one loan rather than all the loans pooled for sale. As already discussed, in her affidavit, Holiday averred that the Pool Supplement Schedule, like the other records, was made at or near the time of the event it records. Just because the Pool Supplement Schedule is on file with the Trust's indenture trustee does not mean that it is not also on file with the Trust itself. Holiday averred in her affidavit that the Pool Supplement Schedule was on file with the Trust, and it was within the trial court's discretion to rely on that testimony. And it is unsurprising that the Pool Supplement Schedule only contains information for one loan, as Holiday's affidavit makes clear that it is a "redacted

copy." That the information relating to the other loans is missing is not evidence that the Trust proffered the wrong schedule. We hold that the trial court did not abuse its discretion in admitting the Pool Supplement Schedule.

### 3. Loan Financial Activity Report, Deferment/Forbearance Summary, and Repayment Schedule

Finally, the Savoys argue that the Loan Financial Activity Report, Deferment/Forbearance Summary, and Repayment Schedule did not qualify as the Trust's business records because the print date on these documents (May 18, 2016) shows that they were not made contemporaneously, were not kept in the course of a regularly conducted business activity, and are untrustworthy. *See* TEX. R. EVID. 803(6)(A), (B), (E). The print date on these documents does not suggest that the documents were prepared on the date they were printed. Each document includes the date for each event recorded. The Loan Financial Activity Report records events from August 25, 2005 to January 8, 2014; the Deferment/Forbearance Summary records events from December 1, 2007 to February 28, 2009; and the Repayment Schedule records events from December 17, 2007 to July 2, 2013. These dates, considered together with Holiday's affidavit testimony, show that the records were kept contemporaneously and created before this litigation began to track the repayment of the loan. Rule 803(6) only requires that the information be recorded at or near the time of the event. It does not also require that the copy of the record proffered into evidence be printed near the time of the event. It is

therefore irrelevant that new copies of the Loan Financial Activity Report, Deferment/Forbearance Summary, and Repayment Schedule were printed after the Trust filed its petition. We hold that the trial court did not abuse its discretion in admitting the Loan Financial Activity Report, Deferment/Forbearance Summary, and Repayment Schedule.

**C.     Whether documents were authenticated under Rule 902(10) or otherwise**

The Savoys further contend that the Trust failed to properly authenticate the three documents relating to the assignment of the loan—the Pool Supplement, Pool Supplement Schedule, and Deposit and Sale Agreement. The Trust responds that it authenticated these documents through Holiday's business-records affidavit.

Under Rule 902(10), business records are self-authenticating and require no extrinsic evidence of authenticity if they meet the requirements of Rule 803(6) and are accompanied by an affidavit that complies with subparagraph (B) of the rule and any other requirements of law. TEX. R. EVID. 902(10). Subparagraph (B) provides a template for a sufficient affidavit, which enumerates the elements of Rule 803(6), discussed above. TEX. R. EVID. 902(10)(B).

Rule 902(10)(B) "does not require the affiant to identify the particular person who originally created the business record in order to satisfy the authentication predicate." *H2O Sols., Ltd. v. PM Realty Grp., LP*, 438 S.W.3d 606, 622 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). "Testimony by a witness

11

or affiant identifying the exhibits as the business records of the proponent of the evidence 'is sufficient evidence to satisfy the authentication requirement of Rule 901(a), regardless of whether the witness had personal knowledge of the contents of this evidence.'" *Id.* (quoting *Concept Gen. Contracting, Inc. v. Asbestos Maint. Servs., Inc.*, 346 S.W.3d 172, 181 (Tex. App.—Amarillo 2011, pet. denied) (brackets omitted).

The Savoys argue that the Pool Supplement and Deposit and Sale Agreement should have been authenticated either by a live witness or as certified copies of public records under Rule 902(4)(B). We disagree. As discussed, a proponent can authenticate a business record with an affidavit that complies with Rule 902(10), which is what the Trust did here.

The Savoys further argue that the Pool Supplement Schedule was not properly authenticated because the schedule was never identified by Holiday. Again, we disagree. In her affidavit, Holiday stated that the Pool Supplement Schedule was "a redacted copy of the Schedule of transferred loans referenced within the Pool Supplement." Thus, the Pool Supplement Schedule was sufficiently identified.

We conclude that Holiday's affidavit complies with Rule 902(10)(B). *See* TEX. R. EVID. 803(6), 902(10)(B). Thus, the Trust's business records—including the Pool Supplement, Pool Supplement Schedule, and Deposit and Sale

12

Agreement—are self-authenticating and require no extrinsic evidence of authenticity to be admitted. *See* TEX. R. EVID. 902; *Foster v. Nat'l Collegiate Student Loan Tr. 2007-4*, No. 01-17-00253-CV, 2018 WL 1095760, at \*6 (Tex. App.—Houston [1st Dist.] Mar. 1, 2018, no pet.) (mem. op.) (in similar case, holding that affidavit of employee of loan's subservicer complied with Rule 902(10)(B) and that attached business records were self-authenticating).

We overrule the Savoys' first issue.

## Sufficiency of Evidence

In their second issue, the Savoys contend that there is legally and factually insufficient evidence to support the trial court's judgment.

## A. Standard of review

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Choice! Power, L.P. v. Feeley*, 501 S.W.3d 199, 208 (Tex. App.—Houston [1st Dist.] 2016, no pet.). When challenged, a trial court's findings of fact are not conclusive if there is a complete reporter's record on appeal. *Id.*

We review a trial court's findings of fact under the same legal-sufficiency-of-the-evidence standard used when determining whether sufficient evidence exists to support an answer to a jury question. *Id.* When considering whether legally sufficient evidence supports a challenged finding, we must consider the evidence

that favors the finding if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.* We view the evidence in the light most favorable to a finding and indulge every reasonable inference to support it. *Id.*

When, as here, a party attacks the legal sufficiency of an adverse finding on an issue on which she did not have the burden of proof, she must demonstrate on appeal that no evidence supports the adverse finding. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). We may sustain a legal-sufficiency challenge to a trial court's finding only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Feeley*, 501 S.W.3d at 208.

The Savoys contend that there is insufficient evidence that (1) they entered into a valid student loan contract with JPMorgan Chase, (2) the loan was assigned to the Trust, (3) interest accrued at the rate alleged by the Trust, and (4) the Trust accelerated repayment of the loan. We consider each contention in turn.

**B.    Sufficient evidence of formation of student loan contract**

First, the Savoys contend that there is insufficient evidence that they entered into a valid loan contract with the loan's originator, JPMorgan Chase. The Trust responds that the Credit Agreement and Disclosure Statement are sufficient evidence that the Savoys entered into a loan contract with JPMorgan Chase.

"To prevail on a breach of contract claim, a party must establish the following elements: (1) a valid contract existed between the plaintiff and the defendant; (2) the plaintiff tendered performance or was excused from doing so; (3) the defendant breached the terms of the contract; and (4) the plaintiff sustained damages as a result of the defendant's breach." *West v. Triple B Servs., LLP*, 264 S.W.3d 440, 446 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The elements of a valid contract are (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 150 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). When an offer prescribes the manner of acceptance, compliance with those terms is required to create a contract. *Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex. 1995). If one party signs a contract, the other party may accept by his acts, conduct, or acquiescence to the terms, making it binding on both parties. *Jones v. Citibank (S.D.), N.A.*, 235 S.W.3d 333, 338 (Tex. App.—Fort Worth 2007, no

15

pet.). To be enforceable, a contract must be sufficiently certain to enable a court to determine the rights and responsibilities of the parties. *Williams v. Unifund CCR Partners Assignee of Citibank*, 264 S.W.3d 231, 236 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

The Credit Agreement is signed by Rebecca Savoy, as borrower, and Theresa Savoy, as cosignor, and is dated August 18, 2005. It shows that the Savoys applied for a student loan in the amount of $15,000 from JPMorgan Chase under its Education One Undergraduate Loan program to finance Rebecca's education at the University of Houston for the academic period of August 2005 to May 2006.

Under the Credit Agreement, the Savoys promised to pay any loan made to them by JPMorgan Chase:

> I promise to pay to your order, upon the terms and conditions of this Credit Agreement, the principal sum of the Loan Amount Requested shown on the first page of this Credit Agreement, to the extent it is advanced to me or paid on my behalf, and any Loan Origination Fee added to my loan (see Paragraph F) ("Principal Sum"), interest on such Principal Sum, interest on any unpaid interest added to the Principal Sum, and other charges set forth herein.

The Credit Agreement set forth the method by which the Savoys would agree to the terms of any loan offered by JPMorgan Chase:

> By signing this Credit Agreement, and submitting it to you, I am requesting that you make this loan to me in an amount equal to the Loan Amount Requested plus any Loan Origination Fee . . . . I agree to accept an amount less than the Loan Amount Requested and to repay that portion of the Loan Amount Requested that you actually lend to me. . . .

16

If you agree to make a loan to me, you will mail me the disbursement check (the "Disbursement Check") and a statement disclosing certain information about the loan in accordance with the federal Truth-in-Lending Act (the "Disclosure Statement"). . . . In addition to other information, the Disclosure Statement will tell me the amount of my disbursement and the amount of the Loan Origination Fee. The Disclosure Statement is part of this Credit Agreement. Upon receipt of the Disclosure Statement, I will review the Disclosure Statement and notify you in writing if I have any questions. My endorsement of the Disbursement Check or allowing the loan proceeds to be used by or on behalf of the Student without objection will acknowledge receipt of the Disclosure Statement and my agreement to be legally bound by this Credit Agreement.

And the Credit Agreement set forth the method by which the Savoys could cancel the loan:

If I am not satisfied with the terms of my loan as disclosed in the Disclosure Statement, I may cancel my loan. To cancel my loan, I will give you a written cancellation notice, together with my unused Disbursement Check or, if I have already endorsed and delivered the Disbursement Check to the School, a good check, payable to you, in the full amount of the Disbursement Check.

The Credit Agreement also addressed deferment periods, terms of repayment, interest, default, and acceleration.

The Disclosure Statement shows that, on August 25, 2005, JPMorgan Chase approved the Savoys' loan request and disbursed to Rebecca loan proceeds in the amount of $15,000 for Loan No. 03206792. The terms included an origination fee of $1,042.78; interest at 8.407 percent; and 240 payments of $149.95, due on the first day of each month, starting July 1, 2007.

17

Thus, the evidence shows that the Savoys applied for a loan from JPMorgan Chase, JPMorgan Chase offered the Savoys a loan on the terms set forth in the Credit Agreement and Disclosure Statement, and the Savoys accepted the offer by allowing the loan proceeds to be used by or on behalf of Rebecca without objection.

The Savoys nevertheless argue that the evidence is insufficient to show a valid contract because, although the Credit Agreement contains a promise, the promise was qualified as follows: "I promise to pay to your order, upon the terms and conditions of this Credit Agreement, the principal sum of the Loan Amount Requested shown on the first page of this Credit Agreement, *to the extent it is advanced to me or paid on my behalf* . . . ." (Emphasis added.) The Savoys contend that their promise to pay was "contingent" on the loan being approved and, because JPMorgan Chase had not yet approved the application when the Savoys signed it, there could not yet have been a meeting of the minds on the essential terms of the contract, including the amount of the loan and the cost-of-credit terms. The Savoys recognize that the terms do appear on the Disclosure Statement, but they contend that the Disclosure Statement cannot be part of the agreement because it is dated August 25, 2005, which is seven days after the date the Credit Agreement was signed. The Savoys contend that, although they signed the Credit Agreement, it does not, without more, constitute a binding contract. We disagree.

18

The Credit Agreement and Disclosure Statement, taken together, evince the essential terms of the loan, including the amount of the loan. The Disclosure Statement evinces the Savoys' assent to those terms. *See Mock v. Nat'l Collegiate Student Loan Tr. 2007-4*, No. 01-17-00216-CV, 2018 WL 3352913, at *6–7 (Tex. App.—Houston [1st Dist.] July 10, 2018, no pet. h.) (mem. op.) (in similar case, holding that credit agreement and disclosure statement constituted sufficient evidence of essential loan terms); *Foster*, 2018 WL 1095760, at *10.

The Savoys' argument overlooks "well-established law that instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000). Courts may construe all the documents as if they were part of a single, unified instrument. *Id.*

The Savoys further argue that there is insufficient evidence that JPMorgan Chase disbursed the loan proceeds because the Trust failed to present a signed disbursement check. However, a signed disbursement check was unnecessary to prove that the proceeds were disbursed because the Trust presented the Disclosure Statement, which states that the proceeds were disbursed on August 25, 2005. The Savoys do not argue that the Disclosure Statement is inaccurate. Nor do they point

19

us to evidence that they cancelled or attempted to cancel the loan after JPMorgan Chase deposited the loan proceeds.

We hold that there is legally and factually sufficient evidence that the Savoys entered into a student loan contract with JPMorgan Chase.

## C.    Sufficient evidence of assignment

Next, the Savoys contend that there is insufficient evidence that the loan was assigned to the Trust. The Trust responds that the Pool Supplement, redacted Pool Supplement Schedule, and Deposit and Sale Agreement show that the loan was assigned by JPMorgan Chase to The National Collegiate Funding LLC and then by National Collegiate to the Trust.

Under the Pool Supplement,[4] JPMorgan Chase sold and assigned to National Collegiate each student loan listed on an attached Pool Supplement Schedule. And National Collegiate, in turn, agreed to sell the loans to the Trust.

The redacted Pool Supplement Schedule contains the information for one of the loans that was sold and assigned under the Pool Supplement.[5] This information, when cross-referenced with the Credit Agreement, Disclosure Statement, and Loan

---

[4]    The Pool Supplement is a supplement to two earlier Amended and Restated Note Purchase Agreements—one dated May 1, 2002 and the other dated July 26, 2002—by and between The First Marblehead Corporation and Bank One, N.A. (Columbus Ohio) by its successor by merger, JPMorgan Chase Bank, N.A.

[5]    In her affidavit, Holiday describes the document as "a redacted copy of the Schedule of transferred loans referenced within the Pool Supplement."

Payment History Report, discussed below, shows that the referenced loan is the loan that JPMorgan Chase made to the Savoys. Among other information, the Pool Supplement Schedule identifies the loan by the lender (Bank One),[6] the loan program (Education One Undergraduate), the borrower's social security number (matching the number provided by Rebecca Savoy in the Credit Agreement), and the principal balance (matching the balance of the Savoys' loan as of the date of the Pool Supplement).

Under the Deposit and Sale Agreement, National Collegiate sold and assigned to the Trust the student loans pooled under various pool supplements listed on an attached Schedule A. Schedule A to the Deposit and Sale Agreement lists the Pool Supplement under which JPMorgan Chase sold and assigned the Savoys' loan to National Collegiate—i.e., the Pool Supplement "entered into by and among The First Marblehead Corporation, The National Collegiate Funding LLC and . . . Bank One, N.A., dated October 12, 2005, for loans that were originated under Bank One's . . . Education One Loan Program . . . ."

In sum, the Pool Supplement shows that JPMorgan Chase transferred, sold, and assigned to National Collegiate the student loans listed on the attached Pool Supplement Schedule and that National Collegiate agreed to sell those loans to the

---

[6] In July 2004, Bank One merged with JPMorgan Chase. In some parts of the record, the loan's originator is identified as Bank One, while in others, it is identified as JPMorgan Chase.

Trust. The redacted Pool Supplement Schedule shows that the loan JPMorgan Chase made to the Savoys was among those sold to National Collegiate. And the Deposit and Sale Agreement shows that National Collegiate sold and assigned to the Trust the student loans listed on each pool supplement listed on an attached Schedule A, which lists the Pool Supplement under which JPMorgan Chase assigned the Savoys' loan to National Collegiate. Thus, these three documents show that JPMorgan Chase assigned the Savoys' loan to National Collegiate, which, in turn, assigned the loan to the Trust. We hold that there is sufficient evidence that the Savoys' loan was assigned to the Trust. *See Mock*, 2018 WL 3352913, at *7 (holding that pool supplement, redacted loan transfer schedule, and deposit and sale agreement constituted sufficient evidence that loan was assigned to trust by originator through intermediary); *Foster*, 2018 WL 1095760, at *7–8 (same).

## D.      Sufficient evidence of interest rate

Next, the Savoys contend that there is insufficient evidence of the loan's interest rate during the term of the loan.

The Credit Agreement in paragraph D discusses in detail how interest on the Savoys' loan was to be calculated throughout its term and provides for capitalization of interest during deferment. Paragraph I also provides for capitalization of interest and fees upon default. The Disclosure Statement states an

22

annual percentage rate of 8.407 percent, with a variable rate based on the average of the one-month LIBOR index published in the "Money Rates" section of *The Wall Street Journal* on the first business day of each of the three calendar months immediately preceding the first day of each calendar quarter. The Loan Financial Activity Report lists the amount of "Interest Accrued" each month on the Savoys' loan through January 8, 2014.

The Savoys provide no evidence and do not contend that the interest rate reflected in these documents is in any way incorrect. Nor do they provide any authority for their argument that the Trust was required to support its claim with calculations supporting each month's interest computation over the life of the loan.

We hold that there is sufficient evidence of the loan's interest rate. *See Mock*, 2018 WL 3352913, at *7 (holding that credit agreement, disclosure statement, and loan financial activity report constituted sufficient evidence of loan's interest rate); *Foster*, 2018 WL 1095760, at *11 (same).

E.     **Insufficient evidence of acceleration**

The Savoys contend that there is insufficient evidence that the maturity of the loan was accelerated.

The Disclosure Statement reflects that the Savoys agreed to pay the loan over a period of 20 years, with payments beginning in July 2007. The Credit Agreement states that, to the extent permitted by law, in the event of a default on

23

the loan, the Trust "will have the right to give [the Savoys] notice that the whole outstanding principal balance, accrued interest, and all other amounts payable to [the Trust] under the terms of this Credit Agreement are due and payable at once."

"Where the holder of a promissory note has the option to accelerate maturity of the note upon the maker's default, equity demands notice be given of the intent to exercise the option." *Ogden v. Gibraltar Sav. Ass'n*, 640 S.W.2d 232, 233 (Tex. 1982). "The accelerated maturity of a note, which is initially contemplated to extend over a period of months or years, is an extremely harsh remedy." *Allen Sales & Servicenter, Inc. v. Ryan*, 525 S.W.2d 863, 866 (Tex. 1975). A creditor "must give the debtor an opportunity to pay the past due installments before acceleration of the entire indebtedness; therefore, demand for payment of past due installments must be made before exercising the option to accelerate." *Williamson v. Dunlap*, 693 S.W.2d 373, 374 (Tex. 1985) (emphasis omitted). The note holder must also notify the maker both of its intent to accelerate and of the acceleration. *Ogden*, 640 S.W.2d at 233–34.

There is no evidence in the record before us that the Trust provided the Savoys with either of the required notices. The Trust alleged in its petition that, as a prerequisite to acceleration, it served the Savoys with a letter demanding payment in full. However, the demand letter is not part of the record, and pleadings are not evidence.

We hold that the evidence is legally and factually insufficient to support the full amount of actual damages awarded. *See Mock*, 2018 WL 3352913, at *8 (holding that evidence was insufficient to show acceleration when trust presented no evidence that it provided debtor with notice of acceleration); *Foster*, 2018 WL 1095760, at *11–12 (same).

When acceleration is invalid, the plaintiff is entitled to judgment against the defendant only "for past due installments plus accumulated interest as provided in the note." *Williamson*, 693 S.W.2d at 374.

The Savoys request that we "reform the judgment to an amount commensurate with the sum of missed installment payments through the date the petition was filed" or, alternatively, "suggest a remittiture to accomplish a proper adjustment of the amount of contract damages proven by the admissible evidence as having been caused by breach of contractual duties." The evidence shows that, the sum of all monthly payments due, beginning on July 1, 2007, as stated in the Disclosure Statement, through the date of the filing of suit, April 15, 2016, is $15,894.70.[7]

A court of appeals may suggest a remittitur when there is insufficient evidence to support the full amount of damages awarded but sufficient evidence to support a lesser award. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. &*

---

[7] Calculated as $149.95 in monthly payments over 106 months.

*Research Corp.*, 299 S.W.3d 106, 124 (Tex. 2009); *see* TEX. R. APP. P. 46.3. If part of a damage verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict, giving the party prevailing in the trial court the option of accepting the remittitur or having the case remanded for a new trial. *Akin, Gump*, 299 S.W.3d at 124.

As set out above, the record contains some evidence that breach-of-contract damages exist, but, without evidence of notice of acceleration, the evidence does not support the full amount awarded by the trial court. The evidence does, however, allow us to determine a lesser award. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 877–78, 880 (Tex. 2010) (holding there was "legally sufficient evidence to prove a lesser, ascertainable amount of lost profits with reasonable certainty," and remanding case to court of appeals to consider suggestion of remittitur).

Based on the record, the evidence is legally and factually sufficient to support a lesser damages finding of $15,894.70, which represents the sum of all monthly payments due, beginning on July 1, 2007, as stated in the Disclosure Statement, through the filing of suit on April 15, 2016. *See Mock*, 2018 WL 3352913, at *9 (suggesting remittitur when plaintiff-trust failed to prove acceleration of loan's maturity); *Foster*, 2018 WL 1095760, at *12 (same); *see also PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 513 (Tex. App.—Houston

26

[14th Dist.] 2016, no pet.) (suggesting remittitur to "the highest amount of actual damages supported by the evidence").

We sustain in part and overrule in part the Savoys' second issue.

## Standing

In their third issue, the Savoys argue that the Trust lacked standing to sue because the loan was paid in full by the loan's second guarantor, The Education Resources Institute, Inc. TERI is a nonprofit organization that provides guaranties for private education loans. The Credit Agreement states that JPMorgan Chase "purchased a guaranty" from TERI. According to the Savoys, the last entry in the Loan Financial Activity Report reflects a principal balance of zero dollars, which shows that TERI assumed and paid the debt after the Savoys defaulted. We disagree.

The Loan Financial Activity Report reflects that the principal balance decreased to zero when a $20,492.05 "transaction" occurred in January 2014. The Loan Payment History Report reflects that the "transaction" did not refer to TERI paying the debt; rather, it referred to the Trust charging off the debt. The Savoys have failed to proffer any evidence that, contrary to these reports, the principal balance decreased to zero because the debt was paid by TERI. *See Mock*, 2018 WL 3352913, at *9 (holding that borrowers failed to show debt was paid by TERI when they failed to proffer evidence of such payment).

27

We overrule the Savoys' third issue.

## Conclusion

We conclude that the evidence is insufficient to support the trial court's award of actual damages in the amount of $20,492.05 but is sufficient to support an award of actual damages in the amount of $15,894.70. Thus, we suggest a remittitur of the actual damages award to $15,894.70. In accordance with Rule 46.3 of the Texas Rules of Appellate Procedure, if the Trust files with this Court, within fifteen days of the date of this opinion, a remittitur to that amount, the trial court's judgment on damages will be modified and affirmed. *See* TEX. R. APP. P. 46.3. If the suggested remittitur is not timely filed, the trial court's judgment will be reversed and the cause will be remanded for a new trial on liability and damages. *See Rancho La Valencia, Inc. v. Aquaplex, Inc.*, 383 S.W.3d 150, 152 (Tex. 2012) (holding that if party rejects remittitur, court of appeals must remand for new trial on liability and damages).


Harvey Brown
Justice

Panel consists of Justices Keyes, Brown, and Lloyd.

28