Opinion issued May 14, 2024



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-21-00602-CV**

———————————

**SENIOR CARE LIVING VI, LLC AND MARK C. BOULDIN, Appellants**

**V.**

**PRESTON HOLLOW CAPITAL, LLC, UMB BANK N.A., AND TMI TRUST COMPANY, Appellees**

---

**On Appeal from the 458th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 19-DCV-265897**

---

## OPINION ON REHEARING

Appellant Mark C. Bouldin has filed a motion for rehearing of our November 30, 2023, opinion and judgment. Additionally, appellee Preston Hollow Capital, LLC ("Preston Hollow") has filed a motion for rehearing and a motion for en banc

reconsideration. We deny the motions for rehearing, withdraw our November 30, 2023 opinion and judgment, and issue this opinion and judgment in their stead.[1]

This case arises out of financing arrangements for the construction of an assisted living facility in Sugar Land, Texas. Appellant Senior Care Living VI, LLC ("Senior Care") borrowed proceeds from the sale of bonds to construct the facility, and it signed a series of promissory notes reflecting this debt. Bouldin guaranteed payment of the notes.

After appellees UMB Bank N.A. and TMI Trust Company, the purported successor trustees under the relevant documents, threatened foreclosure following Senior Care's alleged default on the promissory notes, Senior Care sought a temporary restraining order and asserted claims for affirmative relief. Preston Hollow, the "Noteholder Representative" and "Series 2017A Majority Representative" under the relevant documents, intervened and sought recovery of the outstanding debt from Senior Care and from Bouldin on his guaranty.

---

[1] Because we issue a new opinion, Preston Hollow's motion for en banc reconsideration is moot. *See In re Wagner*, 560 S.W.3d 309, 312 (Tex. App.—Houston [1st Dist.] 2017, orig. proceeding [mand. denied]) ("Because we issue a new opinion in connection with the denial of rehearing, the motion for en banc reconsideration is rendered moot."); *see also Poland v. Ott*, 278 S.W.3d 39, 41 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (noting that motion for en banc reconsideration is rendered moot by withdrawal and reissuance of opinion and judgment); *Brookshire Bros., Inc. v. Smith*, 176 S.W.3d 30, 41 n.4 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (supp. op. on reh'g) (noting that motion for en banc reconsideration is moot when motion for rehearing is granted and new opinion and judgment issue).

The trial court rendered summary judgment that UMB Bank and TMI Trust Company were properly appointed as successor co-trustees. The trial court also dismissed two of Senior Care's affirmative claims pursuant to a Rule 166(g) pretrial management order. After a bench trial, the trial court ruled for Preston Hollow on its claim for breach of the "Bond Documents," finding that Senior Care had defaulted, the debt had been properly accelerated, and Bouldin was liable under his guaranty agreement for the accelerated debt on the promissory notes. The trial court entered judgment against Senior Care and Bouldin, jointly and severally, for $52,597,040.06 in outstanding principal on the accelerated debt and pre-judgment interest, $250,000 in trial-level attorney's fees, and $520,000 in conditional appellate attorney's fees. The court also appointed a post-judgment receiver for Senior Care with authority to sell the property.

Both Senior Care and Bouldin filed notices of appeal. Senior Care raises six issues on appeal and contends that (1) the trial court erred in granting summary judgment that UMB Bank and TMI had been properly appointed as co-Master Trustees; (2) Preston Hollow lacked capacity to sue Senior Care because Preston Hollow had not provided the required notice to the Master Trustee to do so; (3) Preston Hollow failed to prove that Senior Care was liable for breach of the "Bond Documents" because, among other reasons, Preston Hollow failed to prove valid acceleration of the underlying debt; (4) Preston Hollow failed to prove the

3

amounts due under the promissory notes; (5) Preston Hollow was not entitled to a receivership because it did not plead for this relief;[2] and (6) the trial court erred by dismissing Senior Care's claims for conversion and money had and received pursuant to a Rule 166(g) pretrial management order.

Bouldin raises five issues on appeal and contends that (1) Preston Hollow lacked the capacity to sue Bouldin on his guaranty agreement; (2) Preston Hollow cannot recover under the Master Indenture because that document had been amended, but Preston Hollow did not offer the amended document into evidence; (3) the evidence does not support the award of damages; (4) the "conditional" assertion of claims by UMB Bank and TMI do not support the judgment; and (5) the trial court erred by requiring Bouldin to pay attorney's fees.

We affirm in part, reverse in part, and remand for further proceedings.

---

[2] During the pendency of this appeal, the receiver moved for a final accounting and sought to be discharged. On March 21, 2023, the trial court granted this request and, among other things, discharged the receiver from all duties, responsibilities, and obligations under the trial court's post-judgment receivership order. We therefore conclude that Senior Care's fifth issue is moot. *See Glassdoor, Inc. v. Andra Grp., LP*, 575 S.W.3d 523, 527 (Tex. 2019) (stating that case becomes moot during pendency of litigation if issues presented are no longer "live" or parties lack legally cognizable interest in outcome) (quoting *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 162 (Tex. 2012)).

## Background

### A.    *The Transaction to Finance Construction of an Assisted Living Facility*

Mark Bouldin is the president and owner of Senior Care Ownership 3, Inc., the entity that manages Senior Care. Bouldin is a real estate developer who has developed numerous projects over the last twenty years, including several assisted living facilities for seniors throughout the southern United States.

Around 2016, an engineer who works with Bouldin identified a property in Sugar Land that he believed would be ideal for a new assisted living facility called Inspired Living at Missouri City. Throughout the initial stages of development, Bouldin was also having discussions with Piper Jaffray, a bond underwriter, about the possibility of issuing bonds to raise funds to acquire the land and develop the facility. Eventually, an agreement was reached concerning the financing of the project through the issuance and sale of bonds, and the relevant parties executed a series of documents that set out the various rights and obligations.

On January 1, 2017, Woodloch Health Facilities Development Corporation ("Woodloch") issued four tiers of over $44 million in bonds: (1) $30,320,000 in tax-exempt Series 2017A-1 bonds; (2) $2,580,000 in taxable Series 2017A-2 bonds; (3) $2,025,000 in taxable Series 2017A-3 bonds; and (4) $9,750,000 in subordinate Series 2017B bonds. Woodloch entered into a Trust Indenture and Security Agreement ("the Bond Indenture") with Branch Banking and Trust Company

("BB&T"), which agreed to serve as the Bond Trustee. Woodloch and BB&T are the only signatories to the Bond Indenture. Preston Hollow, which purchased over $21 million in Series 2017A-1 bonds, was named the "Series 2017A Majority Representative," a position that had certain rights under the Bond Indenture, but it did not sign this document.

The Bond Indenture contemplated that Woodloch would simultaneously enter into a Loan Agreement with Senior Care, under which Woodloch would loan the proceeds from the sale of the bonds to Senior Care. The Bond Indenture authorized the sale of the bonds, authorized the issuance of promissory notes ("the Notes") to secure repayment of the loan to Senior Care, and assigned most of Woodloch's rights as issuer of the bonds to BB&T as the Bond Trustee. The rights assigned to BB&T included Woodloch's right to receive loan payments from Senior Care.

The Bond Indenture set out the interest rate and maturity date for each series of bonds. This document also directed BB&T to establish several different funds with specific purposes for the bond proceeds and stated that all proceeds "shall be held by the Bond Trustee in trust and shall be applied only in accordance with the provisions of this Bond Indenture." The Bond Indenture contained provisions describing what constitutes an "Event of Default," and it allowed BB&T to accelerate payment of the unpaid principal and interest on the bonds and to exercise remedies upon default. The Bond Indenture also contained provisions authorizing

6

the appointment of co-Bond Trustees, allowing BB&T to resign as the Bond Trustee, and authorizing the appointment of a successor Bond Trustee.

On the same date that Woodloch and BB&T signed the Bond Indenture, Woodloch and Senior Care entered into a Loan Agreement. In this agreement, Woodloch agreed to use the proceeds from the sale of the bonds to fund a loan to Senior Care by depositing the proceeds with BB&T, as provided in the Bond Indenture. Senior Care agreed to use the loan proceeds to "pay a portion of the costs of acquiring, constructing, developing, furnishing[,] and equipping" the assisted living facility. It also agreed to "make payments sufficient to pay the principal of, premium, if any, and interest on the Series 2017 Bonds when due." Senior Care agreed to execute a series of promissory notes to secure payment of the loan, deliver the Notes to BB&T, and make all payments required by the Notes.

In the Loan Agreement, Senior Care also agreed to promptly pay all lawful taxes assessed against the property; promptly pay or satisfy all indebtedness, claims, and demands against it; and ensure that no liens attached to the property. The Loan Agreement defined several "Events of Default," including Senior Care's failure to make any principal or interest payment on the Notes, Senior Care's failure to perform or comply with any covenant contained in the Loan Agreement, and the occurrence of any "Event of Default" under another bond document. The agreement

7

allowed BB&T, upon the occurrence of an Event of Default, to declare all payments due on the Notes to be immediately due and payable.

Senior Care signed four promissory notes, one for each of the bond series issued by Woodloch. Each of the Notes required Senior Care to make interest payments on June 1 and December 1 of each year, beginning in 2017 and ending in the year the respective series of bonds matured. The Notes corresponding to the Series 2017A-2 bonds and the Series 2017B bonds required Senior Care to make yearly principal payments beginning December 1, 2021. For the Series 2017A-1 Note, the yearly principal payment would not begin until December 1, 2028. For the Series 2017A-3 Note, the only principal payment would be on December 1, 2028, the date that series of bonds matured. Woodloch assigned each of the Notes to BB&T.

As part of this transaction, Senior Care and BB&T, as the "Master Trustee," signed a "Master Trust Indenture, Deed of Trust and Security Agreement" ("the Master Indenture"). In the Master Indenture, Senior Care granted a security interest to BB&T in "[a]ll revenue, Accounts (including any Blocked Account),[3] accounts

---

[3] Senior Care and BB&T as the Master Trustee also executed a "Blocked Account Control Agreement." Under this agreement, BB&T maintained a deposit account for Senior Care's benefit, and Senior Care granted BB&T, in its capacity as Master Trustee, a security interest in the funds contained in the account. The Master Indenture required Senior Care to "cause all Gross Revenues to be deposited into the Blocked Account" within seven business days of receipt.

8

receivable, and Gross Revenues" of Senior Care, in any amounts on deposit in the accounts required to be created under the Master Indenture and the Bond Indenture, and the property with improvements. Under the Master Indenture, BB&T held this property in trust "first, for the equal and proportionate benefit and security of the Holders from time to time of all of the Outstanding Senior Obligations . . . ." Preston Hollow, although not a signatory to the Master Indenture, was named the "Noteholder Representative" in this document, and it was granted certain rights.

The Master Indenture contained extensive provisions governing all aspects of the relationship between Senior Care as the obligor, BB&T as the Master Trustee, and Preston Hollow as the Noteholder Representative. For example, the Master Indenture required BB&T to establish several separate funds to be used for specific purposes and directed the priority in which BB&T was to transfer funds to each account. In several instances, Preston Hollow as the Noteholder Representative was granted authority to direct BB&T to take certain actions. For example, if Preston Hollow determined that the balance of the Insurance and Tax Escrow Fund was not sufficient to pay Senior Care's tax obligations, Senior Care could be ordered to deposit additional amounts into that fund.

Senior Care's obligations under the Master Indenture mirrored the obligations imposed upon it in the other key documents. Senior Care agreed to "duly and punctually pay the principal of (and premium, if any) and interest on the

Obligations." It further agreed to pay or discharge all taxes before delinquency, as well as "all lawful claims for labor, materials, and supplies which, if unpaid, might by law become a lien upon its Property." Senior Care also agreed that it "will not create or permit to be created or remain and, at its cost and expense, [will] promptly discharge or terminate all Liens on its Property." Senior Care agreed that, during the construction process, it would not accept any change orders without Preston Hollow's written consent, nor would it amend the terms of any construction documents without Preston Hollow's prior written consent.

"Events of Default" under the Master Indenture included: (1) "default in the payment of any Senior Obligation when it becomes due and payable"; (2) failure to make any required deposits under the Master Indenture; (3) failure to pay any debt owed by Senior Care; (4) failure to cause gross revenues to be deposited into the Blocked Account; and (5) failure to perform any covenant in the Master Indenture. Upon an Event of Default, BB&T had the authority to accelerate the debt and declare the principal of the Obligations due immediately. The Master Indenture also granted Preston Hollow the ability to exercise remedies upon default "in lieu of the Master Trustee." The Master Indenture, like the Bond Indenture, contained provisions allowing for the resignation of BB&T as Master Trustee and the appointment of a successor Master Trustee.

10

Senior Care also entered into a "Construction Disbursement and Monitoring Agreement" ("the CDMA") with BB&T, Preston Hollow as the Series 2017A Majority Representative, and Fulcrum, LLC, an entity that served as a "Construction Monitor" during the building of the assisted living facility. Among other things, the CDMA set out the process for Senior Care to make disbursement requests for the payment of loan proceeds during construction. Preston Hollow played an active role in this process, approving requests for disbursement and ordering BB&T to make payments from specific accounts required under the Master Indenture and Bond Indenture. The CDMA, like the Master Indenture, required Senior Care to submit change orders over a certain amount to Preston Hollow for approval. Although the CDMA could be amended, an amendment would only be effective if made by "a written instrument signed by the parties."

Finally, Bouldin executed a Guaranty Agreement ("the Guaranty").[4] Bouldin "guarantee[d] to the Master Trustee (for the benefit of the Holders) (collectively, the "Guaranteed Parties"), the full, complete and prompt payment of the principal and redemption price, if any, of and interest on the Series 2017 Notes when due, whether

---

[4]  Bouldin also signed a "Completion Guaranty" in which he "guarantee[d] to the Master Trustee (for the benefit of the Holders and the holders of the Series 2017 Bonds) the full, prompt and complete performance by [Senior Care] of all [Senior Care's] obligations with respect to the design, permitting, installation, construction and completion of the Improvements, subject to the terms and conditions of the Loan Documents." The Completion Guaranty is not at issue in this appeal.

at stated maturity . . . acceleration or otherwise" upon the occurrence of certain specified events. These events included: (1) the filing of a mechanic's or materialmen's lien against the property; (2) Senior Care's failure to pay any portion of its Gross Revenues to the Master Trustee as required by the Master Indenture; and (3) an action by Senior Care or Bouldin to contest, delay, interfere with, or fail to cooperate with "the Master Trustee's exercise of remedies provided under the Bond Documents or any guaranty after the occurrence of an Event of Default."

Bouldin also agreed to be liable to "the Guaranteed Parties in all instances for any loss, damage, cost, expense, liability or claim incurred by Guaranteed Parties" arising out of certain other events. These events included Senior Care's failure to pay "other charges required to be paid by [Senior Care] under the Bond Documents" and "charges for labor or materials or other charges that can create liens on the Property." The Guaranty provided that "any Guaranteed Party," following an Event of Default, could proceed directly against Bouldin prior to making a demand upon Senior Care. The Guaranty is the only document in connection with this transaction that Bouldin signed in his individual capacity, and not in his capacity as the president of the entity that manages Senior Care.

**B.** ***Senior Care's Alleged Default on the Promissory Notes***

Senior Care contracted with an Iowa-based company, Baxter Construction Company ("Baxter"), to build the assisted living facility. Bouldin had worked with

Baxter prior to the project that is the subject of this appeal. The "Guaranteed Maximum Price" to which Baxter was entitled for construction costs was $22,240,000. Baxter also served as the general contractor for another construction project that occurred at roughly the same time as this project: the construction of an Inspired Living assisted living facility in Lewisville, Texas, near Dallas. The owner of that property and facility was Senior Care Living VII, LLC.

Construction on the Sugar Land facility proceeded throughout 2017 without any major issues. With construction substantially complete, Senior Care obtained a Certificate of Occupancy around December 2017. However, in 2018, a dispute arose with Baxter over whether Baxter was entitled to more than $1 million in additional funds based on change orders. Senior Care did not believe that these requests were valid. Nevertheless, to settle the dispute, Senior Care, Bouldin, and Baxter entered into a "Side Letter Agreement Regarding Payments to Baxter Construction Company" ("the Side Letter Agreement") in August 2018.[5]

In the Side Letter Agreement, Baxter agreed that it was still bound by provisions in the CDMA that required it to obtain unconditional lien waivers from each of its subcontractors prior to final payment. Senior Care agreed that, upon receipt of these documents, it would "promptly seek payment to Baxter for all

---

[5] This agreement also addressed a payment dispute that had arisen between Baxter and Senior Care Living VII, the entity that owned the assisted living facility being built in Lewisville, Texas.

amounts due Baxter pursuant to the Baxter Payment Documents" by delivering the documents to Preston Hollow, which had the right to approve disbursement requests under the CDMA. Baxter acknowledged that "the timing of payments" was "partially dependent upon parties to the CDMA which are not under the control of any party hereto."

Senior Care and Baxter also agreed that, upon sale of the assisted living facility, Senior Care would pay Baxter up to a maximum amount of $472,500. Senior Care further agreed that, until that payment had been made, "any dividends or distributions payable to Bouldin are secured by and must be forwarded . . . to Baxter." Bouldin agreed that "an amount equal to any dividends or distributions that Bouldin directly or indirectly receives" is "deemed to be held in trust by Bouldin for the benefit of Baxter and must be forwarded by Bouldin to Baxter." Baxter agreed that these specified payments "shall be deemed secured obligations and when timely paid in the manner provided herein shall be in full satisfaction for all outstanding amounts owed to Baxter for its work." Baxter further acknowledged that its rights to payment were subordinate to the rights of the Master Trustee and the bondholders.

Preston Hollow was aware that Senior Care and Baxter had an ongoing dispute concerning payment, but it did not see the Side Letter Agreement until several months after that agreement had been signed. In December 2018, Baxter submitted its final payment request of $1,762,308.80 to Senior Care. It is undisputed that

14

Baxter had not obtained all lien waivers from its subcontractors. Despite this, Senior Care submitted Baxter's payment request to Preston Hollow. Preston Hollow requested that Senior Care provide it with additional information, including the Side Letter Agreement, and it also communicated directly with Baxter concerning the payment dispute. Ultimately, Preston Hollow did not approve the disbursement request to Baxter, and Baxter filed a lien against the property in March 2019.[6]

At the same time that Senior Care sought disbursement of $1.7 million to pay Baxter, it also sought disbursement of approximately $574,000 to pay its property taxes that were due on January 31, 2019. A Preston Hollow employee replied that "there is not a line item in the project budget for [real estate taxes] and funding for this line item via project fund appears to run contrary to the Master Trust Indenture." This employee stated, "[I]t appears that real estate taxes are to be funded by [Senior

---

[6] Senior Care has consistently taken the position that Baxter's lien is untimely because Baxter finished construction in January 2018 but did not file a lien affidavit until March 2019. Senior Care also filed a separate lawsuit against Baxter seeking a declaratory judgment that the lien was void and asserting that the lien was an unlawful cloud on Senior Care's title. Baxter moved to dismiss Senior Care's suit under the Texas Citizen's Participation Act. After the trial court denied the motion to dismiss, Baxter filed an interlocutory appeal. Shortly before trial in the underlying proceeding, this Court issued an opinion affirming the trial court's denial of the motion to dismiss. *See Baxter Constr. Co. v. Senior Care Living VI, LLC*, No. 01-19-00728-CV, 2021 WL 1916476, at *3–4 (Tex. App.—Houston [1st Dist.] May 13, 2021, no pet.) (mem. op.).

Care]." Preston Hollow did not agree to disburse funds to pay the property taxes, and those taxes became delinquent.[7]

On March 25, 2019, at the direction of Preston Hollow, BB&T sent a "Notice of Covenant Breaches and Events of Default and Demand Letter" to Bouldin and Senior Care. This letter stated that Baxter alleged that it was owed over $2.2 million for work performed on the project; Baxter had recorded a lien affidavit and claim in the amount of $1,762,308.80 with the Fort Bend County Clerk; and Senior Care owed approximately $614,000 in assessed and unpaid taxes to three Fort Bend County taxing authorities. The letter informed Senior Care that its failure to pay Baxter's claim within 30 days of the notice would constitute an "Event of Default" under the bond documents. BB&T demanded that Senior Care pay $852,777.11—representing the difference between the amount of Baxter's claim and the amount of funds currently on deposit in the Project Fund—within 30 days. BB&T also made a demand upon Bouldin that he fully pay Baxter's claim pursuant to the Completion Guaranty that he signed. BB&T also stated that Senior Care's failure to extinguish Baxter's lien within 30 days and pay the unpaid taxes within 30 days would also constitute "Events of Default."

---

[7] Ultimately, Preston Hollow approved payment of the property taxes in June 2019 after BB&T had declared Senior Care in default on the Notes and accelerated the balance of the loan.

On April 8, 2019, BB&T sent Senior Care and Bouldin a "Supplemental Notice of Breaches and Events of Default and Notice of Intent to Accelerate." In this letter, BB&T referenced its March 25 letter and stated that if Senior Care failed to timely cure the conditions set out in the previous letter, BB&T or Preston Hollow "shall declare an Event of Default under each of the related Bond Documents and accelerate (subject to further election and notice to you) and declare immediately due and payable all amounts due and owing pursuant to" the various bond documents.

On May 31, 2019, BB&T sent a "Notice of Events of Default under the Bond Documents and Acceleration of Maturity of Notes and Bonds."[8] BB&T stated that Senior Care had failed to cure the conditions set out in the two previous letters. Therefore, BB&T, at Preston Hollow's direction, declared that an "Event of Default" had occurred under the Bond Indenture, the Master Indenture, and the Loan Agreement. BB&T declared that the Notes and the bonds were accelerated and that the entire principal of the Notes and the unpaid principal and interest on the bonds were immediately due and payable in full. On June 3, 2019, Bouldin acknowledged in an email to Gregory Yanok, a vice president at BB&T and Bouldin's main point

---

[8] The day after this notice, on June 1, 2019, an interest payment was due on the Notes. BB&T applied proceeds from a reserve account to this payment, and therefore Senior Care was able to meet this obligation. Senior Care has not, however, made any further interest payments.

of contact, that Senior Care had received a copy of the acceleration notice. Bouldin requested a payoff statement for the total outstanding amount owed. It is undisputed that neither BB&T nor Preston Hollow provided a payoff statement to Senior Care.

In early July 2019, Yanok notified Bouldin via email that BB&T intended to resign as the Master Trustee and Bond Trustee and that TMI "will succeed us as Trustee." Bouldin acknowledged BB&T's resignation and stated that he would "take a look at TMI . . . since [Senior Care] picks the Trustee and Successor Trustee" and would "let [Yanok] know shortly who we'd like to go with." In a later email, Bouldin indicated that Senior Care's management company was "looking into" who it wanted as a successor trustee. Bouldin stated that he did not "think the appointment of the successor is necessary before you resign." Yanok responded, "We need to appoint a successor for the sake of resignation. I [believe] you can appoint anyone thereafter[.]"

On July 12, 2019, BB&T appointed TMI and UMB Bank as co-trustees under the Master Indenture and the Bond Indenture. This notice stated that UMB Bank and TMI "have agreed to assume the role of co-Trustee for each of these trusts," and stated that if BB&T resigns, "the co-Trustees shall succeed to all roles and responsibilities of the predecessor Trustee."

On July 17, 2019, BB&T sent Senior Care a written "Notice of Trustee Resignation." This notice informed Senior Care that BB&T was resigning as Master

18

Trustee and Bond Trustee. BB&T also "recognize[d] the authority of the duly-appointed co-Trustee(s), TMI Trust Company ('TMI') and UMB Financial Corporation ('UMB')" to serve as successor Master Trustees and Bond Trustees. Preston Hollow, as the Noteholder Representative and Series 2017A Majority Representative, sent a notice to all parties on October 10, 2019, "further memorializ[ing]" BB&T's resignation as Master Trustee and Bond Trustee and the appointment of UMB Bank and TMI as co-successor Master Trustee and Bond Trustee.

Preston Hollow and UMB Bank sent notices of additional "Events of Default" by Senior Care in October 2019, after the debt had already been accelerated and Senior Care had filed suit. These alleged defaults included Senior Care's failure to deposit Gross Revenues into the Blocked Account; the transfer of over $300,000 from Senior Care to Senior Care Living VII, the owner of the Lewisville assisted living facility; and Senior Care's failure to replenish the debt service reserve fund after money in that fund was used to make Senior Care's June 1, 2019 interest payment on the Notes. Preston Hollow and UMB Bank did not learn about these alleged defaults until after the original default notices were sent in March, April, and May 2019.

*C.* ***Procedural Background***

In August 2019, UMB Bank posted the property for a foreclosure sale in early September. Senior Care then filed the underlying proceeding against UMB Bank and TMI.[9] Initially, neither Bouldin nor Preston Hollow were parties to this proceeding.[10] Senior Care sought injunctive relief to halt the pending foreclosure sale and to prohibit UMB Bank and TMI from taking any action under the bond documents. Senior Care also sought a declaratory judgment that (1) the appointment of UMB Bank and TMI as Bond Trustees "is void and of no effect"; (2) Senior Care was entitled to select a successor Bond Trustee under the provisions of the Master Indenture; and (3) Senior Care was not in default under the Loan Agreement or Master Indenture.

UMB Bank, in its capacities as co-successor Master Trustee and co-successor Bond Trustee, asserted a counterclaim for breach of contract, alleging that Senior

---

[9]    Senior Care also sued Wade Williams, the substitute trustee under the deed of trust securing the property. Senior Care subsequently nonsuited its claims against Williams. No judgment was rendered against Williams, and he is not a party to this appeal.

[10]   Prior to Senior Care's lawsuit, Preston Hollow filed suit against Bouldin in federal district court. Bouldin argued that Senior Care was a necessary party and suit could not proceed against him alone. After Preston Hollow added Senior Care as a defendant, the federal district court dismissed the case due to lack of diversity of citizenship.

Care had failed to comply with its obligations under the "Bond Documents."[11] As damages, UMB Bank sought recovery of the outstanding amount of principal on the bonds—$44,675,000—as well as interest, fees, and costs. UMB Bank also sought a declaration that it and TMI had been appropriately appointed co-successor Bond Trustees under the Bond Indenture and co-successor Master Trustees under the Master Indenture. Additionally, UMB Bank sought appointment of a receiver for Senior Care.

Preston Hollow filed a petition in intervention and adopted UMB Bank's counterclaims. Preston Hollow also filed a separate suit against Bouldin on the Guaranty, and it requested that the trial court consolidate the two cases. The trial court consolidated the cases, and Bouldin became a party to the underlying proceeding. After Preston Hollow became a party and asserted claims, UMB Bank and TMI "conditionally asserted" the same claims against Senior Care and Bouldin that Preston Hollow asserted. These claims included a claim against Senior Care for breach of contract and a claim against Bouldin under the Guaranty.

After the trial court granted Preston Hollow's motion to consolidate, Senior Care filed an amended petition. In this amended petition, Senior Care alleged that

---

[11] The trial court's Findings of Fact and Conclusions of Law defined "Bond Documents" as the Bond Indenture, the Master Indenture, the Loan Agreement, the Deed of Trust, the Guaranty Agreement, the Completion Guaranty, and "all other documents executed in connection with the bonds."

Preston Hollow had tortiously interfered with the Side Letter Agreement and the bond documents by, among other things, wrongfully declaring default and wrongfully refusing to authorize requested disbursements. Senior Care alleged that UMB Bank and TMI had tortiously interfered with the bond documents by acting as Master Trustees without authority to do so. It alleged that if Preston Hollow was a party to the bond documents, Preston Hollow breached the documents by improperly declaring a default and accelerating the debt. Senior Care also alleged that Preston Hollow, UMB Bank, and TMI had converted its property by wrongfully exercising control over money held by BB&T. In connection with the conversion claim, Senior Care also asserted a claim for money had and received. Senior Care continued to seek declaratory relief.

During the pendency of the proceedings, UMB Bank and TMI moved for the appointment of a receiver. In July 2020, the trial court entered a consent order, noting that UMB Bank, TMI, Preston Hollow, and Senior Care had all consented to the appointment of Michael Morgan of Healthcare Management Partners, LLC, as the receiver of Senior Care's property. Morgan, as the receiver, was given complete control over the property, as well as the right to operate the assisted living facility.

The parties also filed cross-motions for partial summary judgment. Senior Care, in its motions, sought summary judgment that UMB Bank and TMI had not properly been appointed as co-successor Master Trustees under the terms of the

Master Indenture, which contemplated that Senior Care, as the Obligor, should have the first choice for appointing a successor Master Trustee upon BB&T's resignation. As a result, UMB Bank and TMI had no capacity or standing to bring any affirmative claims against Senior Care and their claims should therefore be dismissed. With respect to Preston Hollow, Senior Care argued in a separate summary judgment motion that Preston Hollow lacked capacity to assert any claims against Senior Care because the Master Indenture provided limited authority for Preston Hollow, as the Noteholder Representative, to seek remedies in lieu of the Master Trustee, and it could only do so if it had provided notice to the Master Trustee.

Bouldin moved for summary judgment against Preston Hollow, UMB Bank, and TMI on their claims that he was liable to them under the Guaranty. Specifically, Bouldin argued that the only parties to the Guaranty were Bouldin himself and BB&T as Master Trustee; Preston Hollow was not a party to the Guaranty, and therefore it could not sue him to enforce the Guaranty. He further argued that, to the extent Preston Hollow relied on provisions in the Master Indenture that allowed it, as the Noteholder Representative, to pursue certain remedies, Preston Hollow could not pursue such remedies against Bouldin, who was not a party to the Master Indenture. Bouldin also argued that even if Preston Hollow could enforce the Guaranty, none of the events that would trigger Bouldin's liability under the Guaranty had occurred.

In response to Senior Care's summary judgment motion, UMB Bank, and TMI argued that the language of the Master Indenture allowed both the Master Trustee and the Noteholder Representative to "undertake remedial action in conjunction with one another." UMB Bank and TMI also sought partial summary judgment, arguing that they had been properly appointed as co-successor trustees under the relevant bond documents, and therefore they had capacity to pursue claims against Senior Care.

The trial court signed an order granting UMB Bank and TMI's summary judgment motion. The court granted declaratory judgment and ruled that UMB Bank and TMI had been properly appointed as co-successor Master Trustees and co-successor Bond Trustees. The court denied Senior Care's and Bouldin's summary judgment motions.

Preston Hollow, UMB Bank, and TMI also filed motions for a pretrial determination of a legal matter under Rule of Civil Procedure 166(g) on several of Senior Care's claims. Relevant to this appeal, the defendants argued that the trial court could rule as a matter of law that Senior Care's claims for conversion and money had and received should be dismissed because (1) UMB Bank and TMI were properly appointed as co-successor Bond Trustees under the Bond Indenture and therefore could exercise control over funds held by the trustee; (2) the Bond Indenture provided that the funds were held in trust for the benefit of the

24

bondholders, and therefore the funds did not belong to Senior Care; (3) Preston Hollow was expressly entitled to approve or disapprove of disbursement requests for funds held by the trustee; and (4) the claims were barred by the economic loss rule. The trial court granted this motion and dismissed Senior Care's claims for conversion and money had and received before trial.

Over the course of a week, the trial court heard testimony on the parties' claims in a bench trial. The parties also agreed to submit documentary evidence concerning their attorney's fees, and the trial court reviewed this evidence as well. The court signed a final judgment on August 4, 2021. This judgment incorporated the court's pretrial summary judgment ruling granting a declaratory judgment that UMB Bank and TMI were duly appointed as co-successor Bond Trustees under the Bond Indenture and co-successor Master Trustees under the Master Indenture. The court also incorporated its Rule 166(g) ruling dismissing Senior Care's claims for conversion and money had and received.

The court ordered that Senior Care take nothing on its affirmative claims. It further ordered that Preston Hollow, in its capacities as the Noteholder Representative under the Master Indenture and the Series 2017A Majority Representative under the Bond Indenture, be granted judgment against Senior Care on Preston Hollow's breach of contract claim and against Bouldin under the Guaranty. The court awarded Preston Hollow $52,597,040.06 in damages against

Senior Care and Bouldin, jointly and severally, with this amount consisting of $44,675,000 in outstanding principal, $7,407,359.79 in pre-judgment interest through the start date of the trial, and $514,680.27 in pre-judgment interest from the second day of trial through the date of judgment.

The court further awarded Preston Hollow, UMB Bank, and TMI $250,000 in unpaid attorney's fees and litigation expenses, plus a total of $520,000 in conditional appellate attorney's fees. The court also re-appointed Michael Morgan as the post-judgment receiver and issued a separate order setting out his rights and duties. The court denied "all other claims and causes of action." The trial court also issued extensive findings of fact and conclusions of law in support of its judgment.[12]

Senior Care and Bouldin moved for a new trial. These motions were overruled by operation of law, and both Senior Care and Bouldin filed notices of appeal.

### Appointment of Successor Trustees

In its first issue, Senior Care argues that the trial court erred by granting UMB Bank and TMI's summary judgment motion and ruling that UMB Bank and TMI were properly appointed as co-successor Master Trustees under the Master Indenture. Senior Care also argues that the trial court erroneously denied Senior Care's summary judgment motion on this issue.

---

[12]    Although Senior Care and Bouldin requested that the trial court enter additional and amended findings of fact and conclusions of law, the trial court did not do so.

## A.    *Standard of Review*

We review a trial court's summary judgment ruling de novo. *Hlavinka v. HSC Pipeline P'ship, LLC*, 650 S.W.3d 483, 491 (Tex. 2022). When parties file cross motions for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 259 (Tex. 2018); TEX. R. CIV. P. 166a(c). When the trial court grants one motion and denies the other, we must determine all questions presented and render the judgment the trial court should have rendered. *City of Richardson*, 539 S.W.3d at 259.

Construction of a contract is also a question of law that we review de novo. *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 (Tex. 2021) (per curiam). When construing a contract, our primary concern is to give effect to the "written expression of the parties' intent." *Id.* (quotations omitted). We must construe words in the context in which they are used, but we cannot interpret a contract to ignore clearly defined terms. *Id.* (quotations omitted); *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018) (stating that we interpret contract language according to its plain, ordinary, and generally accepted meaning unless instrument directs otherwise). We must also avoid construing contracts in a way that renders the contractual language meaningless. *Sundown Energy*, 622 S.W.3d at 888.

27

### B. *Whether UMB Bank and TMI Were Properly Appointed as Co-Successor Master Trustees*

Both the Master Indenture and the Bond Indenture contain provisions governing the resignation of the initial Master Trustee and Bond Trustee and the appointment of successor trustees.

Section 8.09 of the Master Indenture provides:

(a) No resignation or removal of the Master Trustee and no appointment of a successor Master Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Master Trustee under Section 8.10.

(b) The Master Trustee may resign at any time by giving written notice thereof to the Obligor. If an instrument of acceptance by a successor Master Trustee shall not have been delivered to the Master Trustee within 30 days after the giving of such notice of resignation, the resigning Master Trustee may petition any court of competent jurisdiction for the appointment of a successor Master Trustee.

(c) The Master Trustee may be removed at any time by Act of the Majority Holders or the Noteholder Representative delivered to the Master Trustee and to the Obligor.

Section 8.09(e) specifically governs appointment of a successor Master Trustee and provides:

If the Master Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Master Trustee for any cause, the Obligor, by an Obligor Request, shall promptly appoint a successor Master Trustee with the consent of the Noteholder Representative (which consent shall not be unreasonably withheld). If, within one year after such resignation, removal or incapability, or the occurrence of such vacancy, a successor Master Trustee shall be appointed by Act of the Noteholder Representative delivered to the Obligor and the retiring Master Trustee, the successor Master Trustee so appointed shall, forthwith upon its acceptance of such appointment,

28

become the successor Master Trustee and supersede the successor Master Trustee appointed by the Obligor. If no successor Master Trustee shall have been so appointed by the Obligor or the Noteholder Representative and accepted appointment in the manner hereinafter provided, the Master Trustee or any Holder of Obligations who has been a bona fide Holder of an Obligation for at least 6 months may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Master Trustee.

Section 8.10 requires every successor Master Trustee to execute an instrument accepting the appointment and deliver the acceptance to the Obligor and the retiring Master Trustee. The resignation of the retiring Master Trustee then becomes effective, and the successor Master Trustee becomes "vested with all the rights, powers, trusts, and duties of the retiring Master Trustee."

Section 8.13 addresses the appointment of co-trustees. Under this section, "[a]t any time or times . . . the Obligor and the Master Trustee shall have power to appoint, one or more Persons to act as co-trustee jointly with the Master Trustee of all or any part of the Trust Estate, with the power to file such proofs of claim and take such other actions pursuant to Article VII herein to make such claims and enforce such rights of action on behalf of the Holders . . . ." Section 8.13(b) directs that Senior Care, as Obligor, "shall join with the Master Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee," but if it does not "join in such appointment" within 15 days of

being asked to do so, "the Master Trustee shall have power to make such appointment on its own."

The Bond Indenture also contains provisions governing the resignation of the Bond Trustee and appointment of a successor. Section 906 allows the Bond Trustee to resign at any time by providing 30 days' notice to the Issuer, Obligor, and "each Holder of Bonds then Outstanding." The Bond Indenture provides as follows with respect to the appointment of a successor Bond Trustee:

> (a)    In case the Bond Trustee hereunder shall resign . . . a successor may be appointed by the Series 2017A Majority Representative or, if there is no Series 2017A Majority Representative, the Obligor, by an instrument or concurrent instruments in writing signed by such Holders; provided, however, that in case of such vacancy the Issuer by an instrument signed by the President may appoint a temporary Bond Trustee to fill such vacancy until a successor Bond Trustee shall be appointed by the Series 2017A Majority Representative, or, if there is no Series 2017A Majority Representative, the Obligor, in the manner provided above; and any such temporary Bond Trustee so appointed shall immediately and without further act be superseded by the Bond Trustee so appointed by the Series 2017A Majority Representative or, if there is no Series 2017A Majority Representative, the Obligor.

Section 916 of the Bond Indenture—like section 8.13 of the Master Indenture—gives the Issuer (Woodloch) and the Bond Trustee the power to appoint a co-trustee. The Issuer "shall join with the Bond Trustee" in executing all instruments necessary to appoint a co-trustee, but if the Issuer does not join in such appointment within 15 days, "the Bond Trustee shall have power to make such appointment on its own." In the summary judgment proceedings, Senior Care argued

30

only that UMB Bank's and TMI's appointments as Master Trustee under the Master Indenture were improper. It did not challenge UMB Bank's and TMI's appointments under the Bond Indenture.

The summary judgment evidence includes an email exchange between Yanok, on behalf of BB&T, and Bouldin that occurred in early July 2019. At that point, BB&T had already sent the notices declaring Senior Care in default and accelerating the debt. On July 5, 2019, Yanok informed Bouldin that BB&T intended to resign as trustee and "TMI Trust Company will succeed us as Trustee." Yanok stated that "[f]or the immediate future, we will maintain the present Agency duties (Registrar and Paying Agent) until such time as we transition those functions to TMI." On July 8, 2019, Bouldin responded and stated: "I'll take a look at TMI (I'm unfamiliar with them currently), since the Obligor picks the Trustee and Successor Trustee, I'll let you know shortly who we'd like to go with."

On July 9, 2019, after Yanok asked Bouldin if he could send certain information on Senior Care to TMI, Bouldin responded that Senior Care's management company was "looking into whom they want as a successor trustee." Bouldin then stated, "So it probably doesn't make sense to get anyone else working on it until they decide. I don't think the appointment of the successor is necessary before you resign though if you're in a time crunch for some reason." Yanok replied:

31

"We need to appoint a successor for the sake of resignation. I [believe] you can appoint anyone thereafter[.]"

On July 12, 2019, three days after Yanok and Bouldin's email exchange concluded, Yanok, on behalf of BB&T, sent Senior Care a "Notice of Co-Trustee Appointment." This notice stated:

> In accordance with the indentures (Indentures) for the referenced bond trusts, Branch Banking and Trust Company ("BB&T["]), as Trustee ("Trustee") has exercised its right to appoint co-Trustees for said trusts. [TMI Trust Company ("TMI") and UMB Financial Corporation ("UMB"), collectively and severally] have agreed to assume the role of co-Trustee for each of these trusts, thereby also assuming all rights and responsibilities of the Trustee under the respective indentures and respective governing documents. Furthermore and in the event that the Trustee resigns or is removed, the co-Trustees shall succeed to all roles and responsibilities of the predecessor Trustee.

Five days later, on July 17, 2019, Yanok sent Senior Care a "Notice of Trustee Resignation." In this document, BB&T gave notice of its intent to resign as "Trustee for said trusts, effective immediately and in no event longer than the 30 days after this notice as provided under the Indentures and governing documents." BB&T also "recognizes the authority of the duly-appointed co-Trustee(s), TMI Trust Company ("TMI") and UMB Financial Corporation ("UMB"), collectively and severally, to also serve also as successor Trustee(s) and upon resignation or removal of the Trustee to thereby assume to all rights and responsibilities of the Trustee under the Indentures and governing documents."

32

On October 10, 2019, Preston Hollow sent a notice memorializing BB&T's two prior notices. Preston Hollow stated that BB&T had resigned as Master Trustee and Bond Trustee. Pursuant to a July 8, 2019 "Co-Trustee Appointment Agreement," TMI and UMB Bank had accepted the appointment as co-successor Master Trustees and Bond Trustees, and Preston Hollow as the Noteholder Representative and Series 2017A Majority Representative consented. In a declaration included as an exhibit in the summary judgment proceedings, Bouldin declared that Senior Care's "consent to the appointment of either UMB Bank or TMI Trust Company" was not obtained, and Senior Care "was not given any right to select or approve the appointment of any substitute trustee."

The trial court granted summary judgment in favor of UMB Bank and TMI. In its order, the court declared that UMB Bank and TMI are "duly appointed and acting co-successor Bond Trustee[s] under the Bond Indenture" and are "duly appointed and acting co-successor Master Trustee[s] under the Master Indenture, made the subject of this lawsuit, respectively." The court incorporated its ruling into the final judgment and again declared that UMB Bank and TMI were duly appointed and acting co-successor Bond Trustees and co-successor Master Trustees. In Finding of Fact Number 8, the court found that "[i]n July 2019, UMB Bank, N.A. ('UMB') and TMI Trust Company ('TMI') were properly appointed co-successor Master

Trustees under the Master Indenture and co-successor Bond Trustees under the Bond Indenture, in place of BBT."[13]

Senior Care argues that the Master Indenture contains plain language concerning the appointment of a successor Master Trustee, but the language was not followed here. Specifically, Section 8.09(e) of the Master Indenture contemplates that Senior Care has the first choice of appointing a successor Master Trustee upon BB&T's resignation. Senior Care contends that because the Master Indenture was not followed, UMB Bank's and TMI's appointments as successor Master Trustees are void, and they may not maintain any cause of action against Senior Care.

UMB Bank and TMI, on the other hand, argue that BB&T permissibly appointed UMB Bank and TMI as co-trustees under Section 8.13 of the Master Indenture—an act which did not require Senior Care's consent—and then resigned as Master Trustee, leaving UMB Bank and TMI as its successors.

We agree with UMB Bank and TMI that their appointment as co-trustees by BB&T under Section 8.13 was effective. The summary judgment evidence demonstrates that on July 12, 2019, BB&T sent a notice appointing UMB Bank and TMI as co-trustees under the Master Indenture and Bond Indenture. Section 8.13 of

---

[13]     In Conclusion of Law Number 72, the trial court concluded that UMB Bank and TMI were appointed as co-successor Master Trustees and co-successor Bond Trustees under the relevant indentures "and, therefore, have capacity and standing to sue, as does the Representative [Preston Hollow] pursuant to section 7.20 of the Master Indenture."

the Master Indenture explicitly vests the Master Trustee with "power to appoint" one or more persons to "act as co-trustee jointly with the Master Trustee."

Senior Care argues that BB&T's action of appointing UMB Bank and TMI as co-trustees was a "nullity" because BB&T did not have the authority to act unilaterally in making this appointment; instead, BB&T was required to obtain Senior Care's consent. The plain language of the contract refutes this argument. Section 8.13 contemplates that the Obligor and the Master Trustee "shall join" in the execution of instruments necessary for such an appointment, but this section also gives the Master Trustee the power to make the appointment "on its own" if the Obligor does not join. The Master Indenture itself thus allowed BB&T, as Master Trustee, to appoint co-trustees, even if Senior Care did not consent to the appointment. We therefore conclude that the trial court properly granted UMB Bank and TMI's motion for summary judgment on whether they had been properly appointed as co-trustees under the Master Indenture.

We overrule Senior Care's first issue.

## Preston Hollow's Capacity to Bring Suit

In its second issue, Senior Care argues that Preston Hollow lacked capacity to sue Senior Care for breach of contract because Preston Hollow failed to satisfy the condition precedent of providing the required notice to the Master Trustee of its

intent to exercise rights and remedies in lieu of the Master Trustee, as required by the Master Indenture.[14]

## A. Preston Hollow's Provision of Notice to Master Trustee

"A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Solar Applications Eng'g, Inc. v. T.A. Operating Co.*, 327 S.W.3d 104, 108 (Tex. 2010). If an express condition is not satisfied, then the party whose performance is conditioned is excused from any

---

[14] Both Bouldin and Senior Care argue—in their second and third issues, respectively—that Preston Hollow cannot recover on its breach of contract claim because the copy of the Master Indenture admitted at trial indicated that it had been amended, but Preston Hollow did not introduce an amended version of the Master Indenture into evidence, and therefore Preston Hollow "failed to prove up the operative text of the Master Indenture—which is the only document that could possibly allow [Preston Hollow] to sue." We first note that Senior Care's claims for affirmative relief included a claim that Preston Hollow "breached the bond documents." At trial, Senior Care offered the original, unamended Master Indenture into evidence during direct examination of Bouldin, and the trial court admitted the exhibit. No party argued that this was an inoperable version of the Master Indenture or sought to introduce an amended Master Indenture into evidence.

Regardless, Bouldin and Senior Care did not carry their burden on this issue. "Parties have the power to modify their contracts." *Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 228 (Tex. 1986). Whether a contract has been modified depends on the parties' intentions and is a question of fact. *Id.* at 228–29. A modification must satisfy the elements of a contract: there must be a meeting of the minds supported by consideration. *Id.* at 228. The party asserting the modification bears the burden of proving modification. *Id.* at 229; *Ifiesimama v. Haile*, 522 S.W.3d 675, 685 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Senior Care did not attempt to establish in the trial court that the Master Indenture had been amended, and it obtained no fact findings on amendments modifying the Master Indenture. We conclude that Senior Care and Bouldin may not argue, for the first time on appeal, that the version of the Master Indenture that Senior Care introduced into evidence is not the operative version of the Master Indenture. We overrule this portion of Bouldin's second issue and Senior Care's third issue.

obligation to perform. *Id.*; *see State Farm Lloyds v. Hanson*, 500 S.W.3d 84, 96 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ("A condition precedent may be either a condition to the formation of a contract or a condition to an obligation to perform an existing agreement.").

To determine whether a condition precedent exists, we must ascertain the intention of the parties, which can only be done by looking at the entire contract. *Solar Applications Eng'g*, 327 S.W.3d at 109. To make performance specifically conditional, "a term such as 'if,' 'provided that,' 'on condition that,' or some similar phrase of conditional language must normally be included." *Id.* (quoting *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990)). When no conditional language is used and another reasonable interpretation of the contract is possible, we construe the terms as a covenant to prevent a forfeiture. *Id.*

Under Rule of Civil Procedure 54, if the plaintiff pleads that all conditions precedent have been performed, the plaintiff is required to prove only the conditions precedent that the defendant has specifically denied. TEX. R. CIV. P. 54; *Hanson*, 500 S.W.3d at 96. Here, in its live pleading, Preston Hollow alleged that "[a]ll conditions precedent to the causes of action and requests for relief asserted in this pleading have occurred, been performed or waived." Senior Care, in its amended answer, asserted that Preston Hollow's claims were barred by failure of condition precedent because Preston Hollow failed to show that it provided written notice to the Master Trustee

37

that it would exercise the rights in Section 7.20 of the Master Indenture in lieu of the Master Trustee.

Section 7.20 of the Master Indenture is entitled "Actions Taken by Noteholder Representative in Lieu of the Master Trustee" and it provides:

> Notwithstanding anything in this Indenture to the contrary, if an Event of Default shall have occurred and be continuing, the Noteholder Representative, in its sole discretion *as evidenced by written notice delivered to the Master Trustee*, may (but shall not be required to), (i) in lieu of the Master Trustee, exercise such one or more of the rights and powers conferred on the Master Trustee by this Article VII or under any Supplement; and (ii) in lieu of the Master Trustee, exercise such rights and powers granted to Issuer under the Indenture, and such rights of the Holders under this Article VII, either by a suit or suits in equity or in law for the enforcement of any appropriate equitable or legal remedy the Noteholder Representative shall deem most expedient in the interests of the Holders.

(Emphasis added.)

Senior Care acknowledges that on August 29, 2019, Preston Hollow's counsel emailed several people, including Lorna Gleason at UMB Bank, and notified them that counsel intended to file an amended complaint in the federal court action against Bouldin that added Senior Care as a defendant. The amended complaint was attached to the email. The email also noted that the amended filing "includes input from" UMB Bank and TMI's counsel. At trial, Gleason agreed that UMB Bank had been informed in writing that Preston Hollow had elected to sue Senior Care before it filed suit against Senior Care.

Preston Hollow also provided a "Supplemental Notice Pursuant to Section 7.20 of the MTI and Section 813 of the Trust Indenture" to UMB Bank and TMI on April 23, 2021, approximately two months before trial. In this letter, Preston Hollow "restat[ed its] election" to pursue claims against Senior Care and Bouldin. Preston Hollow attached to this letter a "Trustee Notice Pursuant to Section 7.20 of the MTI and Section 813 of the Trust Indenture" that it had provided to BB&T on May 31, 2019. In that prior notice, Preston Hollow informed BB&T that it intended to pursue remedies in federal court against Bouldin under the Guaranty. In Finding of Fact Number 33, the trial court found that "Preston Hollow elected to pursue remedies against Senior Care and Bouldin and provided written notice of its election pursuant to Section 7.20 of the Master Indenture."[15]

Preston Hollow argues that section 7.20 does not make its "written notice a prerequisite to proceeding in lieu of the Trustee"; instead, "[t]he provision merely notes that [Preston Hollow's] election to proceed will be 'evidenced' by written notice." We agree with Preston Hollow. Section 7.20 does not contain the hallmarks of a condition precedent, even when read in context with the rest of the contract.

---

[15]   In Conclusion of Law Number 70, the trial court concluded that "[t]he notice contemplated under Section 7.20 is to the Trustee—not Senior Care—and it is for the Trustee's benefit." The court further concluded that Preston Hollow's witnesses "testified that written notice was provided by Preston Hollow to the Trustee, including in the form of default notices, court pleadings and other documents. In any event, the Representative [Preston Hollow] provided written notice of Preston Hollow's election under Section 7.20 of the Master Indenture."

39

Section 7.20 contemplates that written notice will constitute contemporaneous or after-the-fact proof that an election has taken place. To make Preston Hollow's capacity to sue specifically conditional on written notice, "a term such as 'if,' 'provided that,' 'on condition that,' or some similar phrase of conditional language must normally be included." *See Solar Applications Eng'g*, 327 S.W.3d at 109. Section 7.20 contains no such language.

Regardless, the Texas Supreme Court has held that "substantial compliance is the appropriate standard when evaluating whether a party complied with a contractual notice condition." *James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 405 (Tex. 2022). However, "substantial compliance with a condition precedent requiring written notice may not be achieved without a writing in some form." *Id.* In the Rule 11 context, courts have held that emails are sufficient to meet that rule's "in writing" requirement. *See, e.g.*, *Shamrock Psychiatric Clinic, P.A. v. Tex. Dep't of Health & Hum. Servs.*, 540 S.W.3d 553, 561 (Tex. 2018) (per curiam); *Green v. Midland Mortg. Co.*, 342 S.W.3d 686, 691–92 (Tex. App.— Houston [14th Dist.] 2011, no pet.). As such, even if section 7.20 were a condition precedent, that condition may be satisfied by substantial compliance. *See James Constr. Grp.*, 650 S.W.3d at 405; *see also Solar Applications Eng'g*, 327 S.W.3d at 108 ("A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation."). We conclude that the August 29, 2019

40

email from Preston Hollow's counsel complied with Section 7.20's notice requirement.

## B.     *Preston Hollow's Ability to Sue on Behalf of Junior Bondholders*

Senior Care also argues in its second issue that Preston Hollow, as the Noteholder Representative, can only exercise powers that the Master Trustee can exercise under Article VII of the Master Indenture, but even the Master Trustee lacks the authority to sue to recover sums due under the subordinated Series 2017B bonds.[16]

In the final judgment, the trial court rendered judgment for Preston Hollow for "the amounts due and owing pursuant to the Bonds and Notes made the subject of this case" in the amount of $52,597,040.06, which included "outstanding principal in the amount of $44,675,000." In Finding of Fact Number 1, the trial court found that Senior Care was the obligor on four classes of bonds, including $9,750,000 in subordinate Series 2017B bonds, which the court collectively defined as "the Bonds." In Finding Number 2, the court found that "[t]he aggregate unpaid principal amount due in respect of the Bonds is $44,675,000." In Finding Number 9, the court found that "[p]ursuant to the Master Indenture and the Bond Indenture, the Representative [Preston Hollow] is granted the authority to exercise certain rights

---

[16]     In his third issue, Bouldin similarly argues that Preston Hollow does not have authority to sue him under the Guaranty on behalf of the junior noteholders.

and remedies on behalf of the Trustee and the bondholders, including, without limitation, the prosecution of claims and causes of action against the Obligor." The trial court did not make an express finding that Preston Hollow could exercise remedies and recover damages on behalf of the subordinate bondholders, but that finding is implicit.

> Section 7.03(a) of the Master Indenture provides:
>
> Notwithstanding any other provision to the contrary in this Master Indenture or otherwise, the right of the Subordinate Obligations [defined in the Master Indenture as including "the Subordinate Series 2017B-1 Note"] to be secured by the lien and security interests created by this Master Indenture is subject in all respects to the prior payment of the Senior Obligations [defined in the Master Indenture as the Series 2017A Notes], in each case as the same become due. . . . The Master Trustee shall not exercise any remedial action under this Master Indenture or otherwise on behalf of the Holders of any Subordinate Obligations until such time as all amounts with respect to Senior Obligations have been paid in full.

The Bond Indenture contains a similar provision in section 812(a) of that document:

> The Bond Trustee and the Holders of the Series 2017B Bonds hereby acknowledge and agree that the Series 2017B Bonds shall in all respects and at all times be subject to and subordinate to the Series 2017A Bonds, notwithstanding the occurrence of an Event of Default with respect to the Series 2017B Bonds, and the rights and remedies of the Holders of the Series 2017B Bonds shall be subject to the terms of this Article VIII. . . . [T]he Bond Trustee will not exercise any remedial action under this Bond Indenture or otherwise on behalf of such Holders of the Series 2017B Bonds until such time as all amounts with respect to Series 2017A Bonds have been paid in full.

Although the Master Indenture differentiates between "Senior" and "Subordinate" Obligations, it also defines "Obligation" as "*any* promissory note,

guaranty, lease, contractual agreement to pay money or other obligation of the Obligor which is authenticated and delivered pursuant to this Indenture and which is entitled to the benefits of this Indenture." (Emphasis added.) Section 7.02 of the Master Indenture allows the Master Trustee, upon the occurrence of an Event of Default, to "declare the principal of *all the Obligations* to be due and payable immediately." (Emphasis added.) Likewise, under section 802 of the Bond Indenture, the Bond Trustee can "declare the entire unpaid principal of and interest on the Bonds or any series thereof due and payable."

Additionally, section 7.07 of the Master Indenture provides:

Subject to Section 7.03, the Obligor covenants (subject to any notice and grace periods contained herein) that if (i) a default is made in the payment of any installment of interest on any Obligation when such interest becomes due and payable, or (ii) a default is made in the payment of the principal of (or premium, if any, on) any Obligation at the maturity or due date thereof, the Obligor will, upon demand of the Master Trustee, pay to it, for the benefit of the Holders of such Obligations, the whole amount then due and payable on such Obligations for principal, redemption premium, if any, and interest . . . .

Subject to Section 7.03, if the Obligor fail[s] to pay any of the foregoing amounts forthwith upon demand, the Master Trustee, in its own name and as trustee of an express trust, may (subject in all respects to the rights of the Noteholder Representative under Section 7.20) institute a judicial proceeding for the collection of the sums so due and unpaid, and may prosecute such proceeding to judgment or final decree, and may enforce the same against the Obligor or any other obligor upon the Obligations and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Obligor or any other obligor upon the Obligations, wherever situated.

Reading these contractual provisions together, we conclude that section 7.03 and section 812 ensure the priority of the senior Series 2017A Notes and Bonds. Thus, if this series of Notes and Bonds is still outstanding, the Master Trustee or Noteholder Representative cannot first take remedial actions on the subordinate Series 2017B Note and Bonds before the senior obligations are fully satisfied. If, however, an Event of Default occurs, the Master Trustee or Noteholder Representative can accelerate the principal of "all the Obligations," including the subordinate obligations. Nothing in sections 7.03 and 812 provides that, when the entire debt has been accelerated, the Master Trustee or Noteholder Representative can pursue remedies *only* on behalf of the senior bondholders and cannot also pursue remedies on behalf of the subordinate bondholders in the same proceeding.

Construing these provisions in this way maintains the priority of the Series 2017A Notes and Bonds while promoting judicial efficiency by not requiring the Master Trustee or Noteholder Representative to pursue two separate proceedings on behalf of the different classes of bondholders. We therefore conclude that the trial court properly determined that Preston Hollow could maintain suit on the Series 2017B Note.

We overrule Senior Care's second issue.

## Enforcement of Guaranty Agreement

In his first issue, Bouldin argues that Preston Hollow lacks capacity to sue him because he made the Guaranty to BB&T as Master Trustee, not to Preston Hollow, and Preston Hollow therefore cannot establish that it owns the guaranty contract.

A guaranty agreement creates a secondary obligation in which the guarantor promises to be responsible for the debt of another and may be called upon to perform if the primary obligor does not fulfill its debt. *Wasserberg v. Flooring Servs. of Tex., LLC*, 376 S.W.3d 202, 205 (Tex. App.—Houston [14th Dist.] 2012, no pet.). To recover under a guaranty agreement, the party must show proof of: (1) the existence and ownership of the guaranty contract; (2) the terms of the underlying contract by the holder; (3) the occurrence of the conditions upon which liability is based; and (4) the guarantor's failure or refusal to perform the promise. *Chahadeh v. Jacinto Med. Grp., P.A.*, 519 S.W.3d 242, 246 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *Lee v. Martin Marietta Materials Sw., Ltd.*, 141 S.W.3d 719, 720 (Tex. App.—San Antonio 2004, no pet.).

A guarantor may require that the terms of his guaranty be strictly followed and that the agreement not be extended beyond its precise terms by construction or implication. *Wasserberg*, 376 S.W.3d at 206; *Lee*, 141 S.W.3d at 721; *see McKnight v. Va. Mirror Co.*, 463 S.W.2d 428, 430 (Tex. 1971); *see also Chahadeh*, 519 S.W.3d

at 247 ("We strictly construe a guaranty in favor of the guarantor."). We must examine the terms of the guaranty based on the language of the contract. *Wasserberg*, 376 S.W.3d at 206; *Lee*, 141 S.W.3d at 721; *see also Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014) ("If the meaning of a guaranty agreement is uncertain, its terms should be given a construction which is most favorable to the guarantor.") (quotations omitted). Our primary goal is to ascertain and give effect to the parties' intent. *Chahadeh*, 519 S.W.3d at 247. The interpretation of a guaranty agreement is a question of law that we review de novo. *Wasserberg*, 376 S.W.3d at 206; *Lee*, 141 S.W.3d at 720.

In the final judgment, the trial court ordered that Preston Hollow, as the Noteholder Representative and the Series 2017A Majority Representative, "shall be granted judgment against Bouldin for 'Guaranty Obligations' (Count III), jointly and severally with Senior Care, for the amounts due and owing pursuant to the Bonds and Notes made the subject of this case." In Finding of Fact Number 7, the court found that Bouldin executed the Guaranty "in favor of the Master Trustee." In Finding Number 30, the court found that "Preston Hollow presented formal demands to Bouldin to pay Senior Care's obligations as required by his Guaranties, but Bouldin has not done so." In Finding Number 31, the court found that "[t]he multiple Bond Document defaults and Events of Default by Senior Care are recourse triggers

46

under the Bouldin Guaranty, making Bouldin jointly and severally liable for all amounts owed to the Trustee on behalf of the bondholders."[17]

The opening paragraph of the Guaranty provides that Bouldin, as Guarantor, made the Guaranty "to the Guaranteed Parties (as herein defined)." Section 3.01 of the Guaranty then states:

> The Guarantor, as surety, absolutely, unconditionally, and irrevocably *guarantees to the Master Trustee (for the benefit of the Holders) (collectively, the 'Guaranteed Parties')*, the full, complete and prompt payment of the principal and redemption price, if any, of and interest on the Series 2017 Notes when due, whether at stated maturity, by optional tender, upon redemption . . . , acceleration or otherwise, including any claim or other type of right arising from such principal amount such as any deficiency judgment upon foreclosure or claim in bankruptcy, and any other sums incurred by Guaranteed Parties in enforcing this Guaranty and repayment of the Series 2017 Notes (collectively, the 'Guaranteed Obligations'), upon the occurrence of any one of more of the following events of circumstances[.]

(Emphasis added.)

Under Section 3.01, the term "Guaranteed Parties" is broader than simply the Master Trustee; instead, the term also includes "the Holders." The Guaranty states that "the holders of the Series 2017 Notes are referred to herein collectively as the

---

[17]    In Conclusions of Law Numbers 36 and 39, the court concluded that Bouldin "guaranteed Senior Care's obligations pursuant to the Guaranty Agreement" and therefore Bouldin was "jointly and severally liable with Senior Care to the Trustee and Preston Hollow, individually and [as] Representative for the benefit of all bondholders, for all amounts Senior Care owes in respect of the Bonds, including principal, accrued interest, attorneys' fees and costs and the fees and expenses of Preston Hollow and the Trustees."

'Holders.'" The Guaranty also provides that unless terms are defined in the Guaranty itself, the terms "shall have the meanings set forth in the Master Indenture." Under the Master Indenture, a "Holder" is "the registered owner of any Obligation." "Obligation" is defined in the Master Indenture as "any promissory note, guaranty, lease, contractual agreement to pay money or other obligation of the Obligor which is authenticated and delivered pursuant to this Indenture and which is entitled to the benefits of this Indenture. Obligations include Senior Obligations and Subordinate Obligations."[18]

The Master Indenture gives the "Majority Holders" the right to appoint a representative—the Noteholder Representative—to take certain actions under the Master Indenture to protect the Majority Holders' rights.[19] "A Noteholder Representative may be a Holder." The Master Indenture named Preston Hollow as the initial Noteholder Representative, and the parties do not dispute that Preston Hollow remained in this position during all periods relevant to this case.

---

[18]   The Master Indenture defines "Senior Obligations" as "the Series 2017A Notes and any other Obligation issued hereunder on a *pari passu* basis with the Series 2017A Notes." "Subordinate Obligations" are defined as "any Obligation issued hereunder on a basis subordinate to the Senior Obligations, including but not limited to the Subordinate Series 2017B-1 Note."

[19]   The Master Indenture defines "Majority Holders" as "the Holders of not less than a majority in aggregate principal amount of the Outstanding Senior Obligations."

The Notes do not specifically name any of the purchasers of the bonds, but they do state that they were issued for the purpose of securing the payment of the principal and interest on the bonds. They also include the following provisions:

> Copies of the Master Indenture are on file at the corporate trust office of the Master Trustee and reference is hereby made to the Master Indenture for the provisions, among others, with respect to the nature and extent of the rights of the holder of this Note, the terms and conditions on which, and the purposes for which, this Note is issued and the rights, duties and obligations of the Obligor and the Master Trustee under the Master Indenture, to all of which the holder hereof, by acceptance of this Note, assents.
>
> . . . .
>
> The holder of this Note shall have no right to enforce the provisions of the Master Indenture, or to institute any action to enforce the covenants therein, or to take any action with respect to any default under the Master Indenture, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Master Indenture.
>
> This Note shall be registered on the register to be maintained by the Master Trustee and this Note shall be transferable only upon said register at said office by the registered owner or by his duly authorized attorney. . . .
>
> The Obligor, the Master Trustee and any paying agent shall deem and treat the person in whose name this Note is registered as the absolute owner hereof for all purposes; and neither the Obligor, any paying agent, the Master Trustee nor any Obligation registrar shall be affected by any notice to the contrary.

In the Notes, Senior Care promised to pay certain sums to Woodloch. The Series 2017A-1 Note includes the following "Assignment to Bond Trustee" signed by Woodloch:

49

Pay to the order of BRANCH BANKING AND TRUST COMPANY, as Bond Trustee for the owners of the Series 2017A-1 Bonds hereinabove mentioned, without warranty and without recourse against the undersigned except warranty of good title, warranty that the Issuer has not assigned this Series 2017A-1 Note to a person or entity other than the Bond Trustee, and that the original principal amount thereof remains unpaid hereunder.

Each of the other Notes contains an identical assignment that references the specific series of bonds and the Note to which the assignment applies. The Loan Agreement also acknowledged that Senior Care "has executed and delivered to the Bond Trustee [BB&T], the Series 2017 Notes (as hereinafter defined) to further secure the payment of the Series 2017 Bonds."

It is undisputed that Preston Hollow purchased bonds and is also both the Noteholder Representative and the Series 2017A Majority Representative. However, the record includes no documentary evidence or testimony that Preston Hollow was a registered owner of the Notes, such that it qualifies as a "Holder" under the Master Indenture. Although the Noteholder Representative "may" be a Holder, it is not required to be. Thus, Preston Hollow's status as the Noteholder Representative, standing alone, does not constitute evidence that Preston Hollow was a registered owner of the Notes. In the absence of evidence that Preston Hollow was a Holder of the Notes, Preston Hollow does not qualify as one of the "Guaranteed Parties" entitled to enforce the Guaranty. *See Chahadeh*, 519 S.W.3d at 246 (stating that to

recover under guaranty agreement, party must establish existence and ownership of guaranty contract).

Preston Hollow argues that even if it cannot sue Bouldin under the terms of the Guaranty itself, it has authority to do so as the Noteholder Representative under the Master Indenture and as the Series 2017A Majority Representative under the Bond Indenture. For support, Preston Hollow relies on sections 7.07 and 7.20 of the Master Indenture to argue that, as the Noteholder Representative, it has the authority to act in lieu of the Master Trustee to enforce certain obligations, including Bouldin's obligations under the Guaranty. Section 7.07 provides, in relevant part:

> Subject to Section 7.03, if the Obligor [Senior Care] fail[s] to pay any of the foregoing amounts forthwith upon demand, the Master Trustee, in its own name and as trustee of an express trust, may (subject in all respects to the rights of the Noteholder Representative under Section 7.20) institute a judicial proceeding for the collection of the sums so due and unpaid, and may prosecute such proceeding to judgment or final decree, and may enforce the same against the Obligor or any other obligor upon the Obligations and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Obligor or any other obligor upon the Obligations, wherever situated.

Section 7.20 allows the Noteholder Representative, if an Event of Default has occurred, to act in lieu of the Master Trustee by "exercis[ing] such one or more of the rights and powers conferred on the Master Trustee by this Article VII [of the Master Indenture] or under any Supplement" or by "exercis[ing] such rights and

powers granted to Issuer under the Indenture, and such rights of the Holders under this Article VII . . . ."

Additionally, Preston Hollow points to similar provisions in the Bond Indenture. Section 803(a) of the Bond Indenture allows "the Bond Trustee (or in lieu thereof, pursuant to Section 813, the Series 2017A Majority Representative)," upon an Event of Default, to "protect and enforce its rights as the holder of the Series 2017A Note and the rights of the Holders." Section 813, like section 7.20 of the Master Indenture, allows the Series 2017A Majority Representative, in lieu of the Bond Trustee, to exercise "such one or more of the rights and powers conferred on the Bond Trustee by this Article VIII or Section 405 hereof" or "such rights and powers granted to Issuer under the Bond Indenture, and such rights of the Holders under this Article VIII . . . ." Section 405 allows the Bond Trustee to "enforce all of the rights of the Issuer . . . and all obligations of the Obligor under and pursuant to the Loan Agreement and the Notes for and on behalf of the Holders."

We disagree that Preston Hollow's status as Noteholder Representative and Series 2017A Majority Representative grant it authority to enforce the Guaranty against Bouldin. The text of the Guaranty itself says nothing about allowing either the Noteholder Representative or the Series 2017A Majority Representative to act for the Master Trustee in pursuing remedies under the Guaranty. Instead, the remedies provision of the Guaranty, section 4.05, states as follows:

> Upon the occurrence of any Event of Default, the Master Trustee may, or at the direction of the Noteholder Representative pursuant to Section 7.02 of the Master Indenture shall: (a) demand immediate payment in full of all Guaranteed Obligations; or (b) exercise such rights and remedies it may have under this Guaranty or any of the other Bond Documents; or (c) exercise with respect to any collateral any one or more of the rights and remedies provided a secured party under the UCC; or (d) exercise from time to time any other rights and remedies available to it at law, in equity or otherwise.[20]

This section references the Noteholder Representative,[21] but it provides only that the Noteholder Representative may direct the Master Trustee to take action after an Event of Default. Contrary to the sections of the Master Indenture and the Bond Indenture allowing the Noteholder Representative and the Series 2017A Majority Representative to act "in lieu of" the Master Trustee or Bond Trustee, section 4.05 of the Guaranty does not allow the Noteholder Representative to step into the shoes of the Master Trustee and act in lieu of it.

---

[20]    Section 7.02 of the Master Indenture allows the Master Trustee on its own initiative—or at the direction of the Noteholder Representative—to accelerate the payment of the principal of the Obligations upon an Event of Default.

[21]    In addition to section 4.05, the Noteholder Representative is mentioned four other times in the Guaranty. Section 3.01 sets out 12 situations in which Bouldin agreed to be liable for Senior Care's obligations, including if any liens are filed against the property "unless such claims or liens have been filed due to a default by the Noteholder Representative in approving disbursements requests" or if Senior Care or Bouldin closes the project or allows a change in the operator of the facility without the Noteholder Representative's prior consent. Section 3.06 grants the Noteholder Representative the ability to direct Bouldin "to secure the Guaranteed Obligations with certain collateral" if Bouldin becomes liable for payment under the Guaranty. Finally, section 4.07 provides that either the Master Trustee or the Noteholder Representative can waive "breach of any agreement contained in this Guaranty," but that waiver is limited to "the particular breach so expressly waived."

53

In drafting the Guaranty, Bouldin and BB&T expressly referred to the Master Indenture several times, including by providing that terms not defined in the Guaranty itself "shall have the meanings set forth in the Master Indenture" and by specifically referring to section 7.02 in the remedies provision of the Guaranty. No such references to sections 7.07 or 7.20—or to sections 803 or 813 of the Bond Indenture—exist in the Guaranty. Bouldin and BB&T could have drafted the Guaranty in such a way to mirror the Master Indenture and Bond Indenture and allow, upon an Event of Default, the Noteholder Representative or Series 2017A Majority Representative to pursue remedies on behalf of the Guaranteed Parties and enforce the Guaranty against Bouldin. However, they did not.

Longstanding Texas caselaw provides that "a guarantor may require that the terms of his guaranty be strictly followed" and that the guaranty "may not be extended beyond its precise terms by construction or implication." *Reece v. First State Bank of Denton*, 566 S.W.2d 296, 297 (Tex. 1978); *Fed. Deposit Ins. Corp. v. Attayi*, 745 S.W.2d 939, 943 (Tex. App.—Houston [1st Dist.] 1988, no writ); *Wasserberg*, 376 S.W.3d at 206; *see also Chahadeh*, 519 S.W.3d at 247 ("We strictly construe a guaranty in favor of the guarantor."). We therefore decline to look to the language of two contracts to which Bouldin is not a party in his individual capacity—the Master Indenture and the Bond Indenture—to provide that Preston Hollow as the Noteholder Representative and the Series 2017A Majority

Representative can enforce the Guaranty against Bouldin when the language of the Guaranty itself does not grant the Noteholder Representative or the Series 2017A Majority Representative this power. *See Reece*, 566 S.W.2d at 297 ("We agree that a guarantor may require that the terms of his guaranty be strictly followed and that he is not bound by a new or different contract.").

We sustain Bouldin's first issue.

## Acceleration of the Debt

In Senior Care's fourth issue and in Bouldin's third issue, both appellants argue that the evidence presented at trial does not support the damages awarded by the trial court. Although Senior Care and Bouldin raise some distinct arguments in these issues, both argue that Preston Hollow did not prove that the debt was properly accelerated.

### A.     *Standard of Review*

In a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and on appeal, we review the sufficiency of the evidence supporting those findings by using the same standards for reviewing jury verdicts. *Hall v. Lewis*, 639 S.W.3d 197, 204–05 (Tex. App.—Houston [1st Dist.] 2021, no pet.); *see Tex. Outfitters Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019). When challenged, the court's findings of fact are not conclusive if, as here, there is a complete reporter's record on appeal. *Hall*, 639 S.W.3d at 205; *Choice! Power, L.P.*

*v. Feeley*, 501 S.W.3d 199, 208 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)). We defer to unchallenged findings of fact that are supported by some evidence. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014).

When reviewing the legal sufficiency of the evidence, we consider whether the evidence presented at trial would enable reasonable and fair-minded people to reach the verdict under review. *Wood v. Wiggins*, 650 S.W.3d 533, 544 (Tex. App.—Houston [1st Dist.] 2021, pet. denied); *see City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Wood*, 650 S.W.3d at 544. We consider the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that supports the finding. *Hall*, 639 S.W.3d at 205. We may not disregard evidence that allows only one inference. *Puntarelli v. Peterson*, 405 S.W.3d 131, 135 (Tex. App.—Houston [1st Dist.] 2013, no pet.). If the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the factfinder. *Wood*, 650 S.W.3d at 544. The factfinder is the sole judge of the credibility of the witnesses and the weight to give to their testimony. *Hall*, 639 S.W.3d at 205; *Puntarelli*, 405 S.W.3d at 135.

When we review the factual sufficiency of the evidence, we consider all the evidence supporting and contradicting the challenged finding. *Wood*, 650 S.W.3d at 544; *Puntarelli*, 405 S.W.3d at 135. We will set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Hall*, 639 S.W.3d at 205; *Puntarelli*, 405 S.W.3d at 135.

We review a trial court's conclusions of law de novo. *BMC Software*, 83 S.W.3d at 794; *Wood*, 650 S.W.3d at 544. We will uphold conclusions of law if the judgment can be sustained on any legal theory supported by the evidence. *Wood*, 650 S.W.3d at 544; *Ferrara v. Nutt*, 555 S.W.3d 227, 235–36 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Incorrect conclusions of law do not require reversal if the controlling fact findings support the judgment under a correct legal theory. *Ferrara*, 555 S.W.3d at 236; *see Wood*, 650 S.W.3d at 544 (stating that erroneous conclusion of law does not require reversal if trial court rendered proper judgment).

## B.    *Preservation of Error*

Preston Hollow argues that Senior Care and Bouldin cannot challenge Preston Hollow's alleged failure to prove that the debt was properly accelerated because Preston Hollow, UMB Bank, and TMI pleaded that all conditions precedent to suit had been performed, but Senior Care and Bouldin did not specifically challenge the failure to provide notice of intent to accelerate. *See* TEX. R. CIV. P. 54; *Hanson*, 500 S.W.3d at 96 (stating that if plaintiff pleads that all conditions precedent have been

performed, plaintiff is required to prove only conditions precedent that defendant specifically denied).

Senior Care and Bouldin, however, both argue that they may permissibly raise this issue because the trial court made express fact findings on whether the debt had been properly accelerated, and parties may challenge the sufficiency of the evidence supporting fact findings made after a bench trial for the first time on appeal.

The trial court admitted evidence of the notices of default, of intent to accelerate the debt, and of acceleration. In Finding of Fact Number 18, the trial court found: "Preston Hollow did not breach the Bond Documents. Senior Care defaulted on its obligations under the Bond Documents. The Trustee gave a notice of the defaults. The defaults were not timely cured. Senior Care's indebtedness under the Bond Documents was properly accelerated on May 31, 2019." Additionally, in Finding Number 29, the court found that "[o]n May 31, 2019, BBT the predecessor Trustee, properly accelerated all amounts due and owing with respect to the Bonds and provided Senior Care and Bouldin with notice of such acceleration."

Following a bench trial, a party may make "a complaint regarding the legal or factual insufficiency of the evidence—including a complaint that the damages found by the court are excessive or inadequate" for the first time on appeal. TEX. R. APP. P. 33.1(d); *see Savoy v. Nat'l Collegiate Student Loan Tr. 2005-3*, 557 S.W.3d 825, 839 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (concluding, when record

58

contained no evidence that creditor provided debtors with either notice of intent to accelerate debt or notice of acceleration, that evidence was legally and factually insufficient to support full amount of damages awarded). Because evidence of acceleration was admitted at the bench trial and the trial court made express fact findings that the debt was properly accelerated, we conclude that Senior Care and Bouldin can raise this sufficiency challenge on appeal.

## C. *Whether the Debt Was Properly Accelerated*

To prevail on a claim for breach of contract, the plaintiff must establish (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages as a result of the breach. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019); *Fortitude Energy, LLC v. Sooner Pipe LLC*, 564 S.W.3d 167, 180 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

A promissory note is a contract evincing an obligation to pay money. *Jim Maddox Props., LLC v. WEM Equity Cap. Invs., Ltd.*, 446 S.W.3d 126, 132 (Tex. App.—Houston [1st Dist.] 2014, no pet.). To recover on a promissory note, the plaintiff must prove (1) the note in question; (2) the defendant signed the note; (3) the plaintiff is the owner or holder of the note; and (4) a certain balance is due and owing on the note. *Dorsett v. Hisp. Hous. & Educ. Corp.*, 389 S.W.3d 609, 613 (Tex.

59

App.—Houston [14th Dist.] 2012, no pet.) (quoting *Geiselman v. Cramer Fin. Grp., Inc.*, 965 S.W.2d 532, 536 (Tex. App.—Houston [14th Dist.] 1997, no writ)).

"Where the holder of a promissory note has the option to accelerate maturity of the note upon the maker's default, equity demands notice be given of the intent to exercise the option." *Ogden v. Gibraltar Sav. Ass'n*, 640 S.W.2d 232, 233 (Tex. 1982); *Savoy*, 557 S.W.3d at 839. Because a promissory note is "initially contemplated to extend over a period of months or years," the accelerated maturity of a note "is an extremely harsh remedy." *Savoy*, 557 S.W.3d at 839 (quoting *Allen Sales & Servicenter, Inc. v. Ryan*, 525 S.W.2d 863, 866 (Tex. 1975)).

A creditor must give the debtor an opportunity to pay the past due installments before accelerating the entire indebtedness; thus, the creditor must make a demand for payment of past due amounts before exercising the option to accelerate. *Id.* (quoting *Williamson v. Dunlap*, 693 S.W.2d 373, 374 (Tex. 1985) (per curiam)); *see Ogden*, 640 S.W.2d at 234 ("Notice of intent to accelerate is necessary in order to provide the debtor an opportunity to cure his default prior to harsh consequences of acceleration and foreclosure."). For acceleration to be effective, the holder of the note must notify the maker of both its intent to accelerate and of the acceleration. *Savoy*, 557 S.W.3d at 839; *see Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 566 (Tex. 2001); *Ogden*, 640 S.W.2d at 233–34. If, after notice of intent to accelerate, the debtor fails to remedy the breach, then the creditor is authorized to

accelerate maturity. *Ogden*, 640 S.W.2d at 233; *Karam v. Brown*, 407 S.W.3d 464, 469–70 (Tex. App.—El Paso 2013, no pet.) ("If the default has not been cured by the deadline established in the notice, the lender must then give notice of acceleration.").

Notice that the debt has been accelerated is ineffective unless preceded by proper notice of intent to accelerate. *Ogden*, 640 S.W.2d at 234. In *Ogden*, the holder of the promissory note and deed of trust lien provided the following notice after Ogden's default on the debt:

> (1) You have breached the covenant to pay sums due under your promissory note.
>
> (2) To cure such breach you must pay to Gibraltar $1,315.08 no later than September 16, 1978. A late charge of $3.68 will be due after August 16, 1978. In addition, beginning September 1, 1978, the September regular monthly payment will also be due.
>
> (3) Your failure to cure such breach on or before said date may result in acceleration of the sums secured by the Deed of Trust and sale of the property standing as security thereunder.
>
> Further, you are notified of your right to reinstate after acceleration and the right to bring a court action to assert the nonexistence of a default or any other defense you may have to acceleration and sale.

*Id.* at 233. The Texas Supreme Court held that this letter was insufficient to provide notice that the creditor intended to exercise its option to accelerate the debt. *Id.* at 234. The deed of trust gave the creditor the option to accelerate the note upon default, but it was not required to do so, and the letter "gave no clear and unequivocal notice that [the creditor] would exercise the option." *Id.* Instead, the letter "merely restated

the option conferred in the deed of trust." *Id.* Because the creditor did not give proper notice of its intent to accelerate the debt, the attempted acceleration was ineffective. *Id.*

Since *Ogden*, Texas appellate courts have reaffirmed that a notice of intent to accelerate must "clearly inform the [debtor] of each event that is considered by the [creditor] to be a default." *Schuhardt Consulting Profit Sharing Plan v. Double Knobs Mountain Ranch, Inc.*, 468 S.W.3d 557, 571 (Tex. App.—San Antonio 2014, pet. denied). If the creditor intends to accelerate maturity of the debt, the notice must "unequivocally" inform the debtor of the creditor's intention. *Id.*; *see Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890, 893 (Tex. 1991) (requiring notice of intent to accelerate to be "clear and unequivocal" to be effective). Courts generally construe unclear or equivocal language in a manner to avoid acceleration. *Schuhardt Consulting Profit Sharing Plan*, 468 S.W.3d at 571; *see Burns v. Stanton*, 286 S.W.3d 657, 661 (Tex. App.—Texarkana 2009, pet. denied) (stating that because acceleration of debt "is viewed as a harsh remedy," courts will strictly construe acceleration clauses in instruments).

Senior Care and Bouldin argue that the language in BB&T and Preston Hollow's notices, like the notice of intent to accelerate in *Ogden*, was not a clear and unequivocal notice of intent to accelerate. On March 25, 2019, BB&T gave Senior Care and Bouldin a "Notice of Covenant Breaches and Events of Default and

Demand Letter with Respect to the [four series of bonds that had been issued]." After identifying the relevant governing documents, BB&T—at Preston Hollow's direction—notified Senior Care and Bouldin of five "conditions" that currently existed with "respect to the Project and the indebtedness under the above-referenced Bonds and loan documents": two conditions that related to Baxter's lien and claim for payment, and three conditions that related to the unpaid ad valorem taxes assessed by various Fort Bend County taxing authorities.

The notice stated that failure to resolve each condition within 30 days "will constitute an Event of Default" under the Master Indenture, Bond Indenture, Loan Agreement, and the Deed of Trust. BB&T demanded that Senior Care and Bouldin take several actions, including that: (1) Senior Care remit $852,777.11 to BB&T, representing the "difference between the amount of the [Baxter claim] and the amount of funds currently on deposit in the Project Fund"; (2) Bouldin fully pay and discharge all claims for labor, materials, and services for the Project pursuant to the Completion Guaranty; (3) Senior Care take all actions and pay any funds necessary to release or otherwise extinguish Baxter's lien on the property; (4) Bouldin release and discharge all construction and equitable liens pursuant to the Completion Guaranty; and (5) remit the amount of unpaid taxes to the Fort Bend County taxing authorities.

On April 8, 2019, BB&T gave Senior Care and Bouldin a "Supplemental Notice of Breaches and Events of Default and Notice of Intent to Accelerate." This notice stated:

> Enclosed, as Exhibit A, is our letter dated March 25, 2019. We supplement our March 25 letter to provide the following information and to provide notice of intent to accelerate.
>
> In the event you should fail to timely pay or otherwise cure the "Conditions" outlined in Section 1 of the March 25 letter, the Trustee and/or Series 2017A Majority Representative shall declare an Event of Default under each of the related Bond Documents and accelerate *(subject to further election and notice to you)* and declare immediately due and payable all amounts due and owing pursuant to the [Master Indenture], the Loan Agreement, the Bonds, the Obligations and the related Bond Documents. Your payment or cure should be made or accomplished no later than thirty (30) calendar days from the date of this Supplemental Notice.
>
> The introductory paragraph of the March 25 letter is hereby restated in its entirety to read as set forth in the introductory paragraph of this Supplemental Notice.
>
> Each of the Trustee and the Holders of the Series 2017A Bonds expressly reserves the right, at any time, to exercise any rights, powers, or remedies available to it or them under the Bond Documents. Please be further advised that this notice and demand letter does not (i) constitute an agreement by the Trustee or the Holders of the Series 2017A Bonds to enter into any amendment, waiver, or other modification of the Bond Documents, (ii) waive any default or Event of Default, (iii) establish a course of dealing, or (iv) waive, limit, condition, or prejudice any of the Trustee's or the Holders' of the Series 2017A Bonds rights or remedies under the Bond Documents or applicable law, all of which rights and remedies are expressly reserved.

(Emphasis added.)

In a May 31, 2019 notice entitled "Notice of Events of Default under the Bond Documents and Acceleration of Maturity of Notes and Bonds," BB&T stated that Senior Care had failed to cure the conditions outlined in the March 25 letter and April 8 notice, and it declared that an Event of Default had occurred under the Bond Indenture, Master Indenture, and Loan Agreement. BB&T stated, in bold:

> As directed by the Noteholder Representative and Series 2017A Majority Representative and in accordance with Section 7.02 of the [Master Indenture], Section 802 of the [Bond Indenture] and Section 602(e) of the Loan Agreement, the Trustee hereby declares the Acceleration of the Notes and the Acceleration of the Bonds. Accordingly, (i) the entire unpaid principal of and interest on the Bonds has forthwith and immediately become due and payable, subject to Section 812 of the [Bond Indenture] and (ii) the principal of all the Notes has become immediately due and payable in full.

BB&T directed this notice to the holders of the bonds, posted the notice on the Electronic Municipal Market Access ("EMMA") website,[22] and provided the notice to Bouldin and Senior Care.

We agree with Senior Care and Bouldin that the language of BB&T's April 8 notice was not unequivocal. As Bouldin points out, the Master Indenture gives the Master Trustee the option to accelerate payment of the amounts owed by Senior Care

---

[22] The EMMA website is maintained by the Municipal Securities Rulemaking Board, and it provides extensive information about bond projects to the public. In the summary judgment proceedings, UMB Bank and TMI included a printout of the information relevant to this project that had been posted on EMMA. This information included Senior Care's financial statements and balance sheets, monthly reports, notices of default, BB&T's notice of resignation, the notice of the co-trustee appointments, and notice of the foreclosure sale.

upon the occurrence of an Event of Default. By including the parenthetical "(subject to further election and notice to you)" in the April 8 notice, BB&T failed to unequivocally indicate that Senior Care's failure to cure the alleged defaults would automatically result in acceleration. Instead, the notice suggests that an additional election and notice would need to be made in the future.

Due to the harsh consequences of acceleration, we "generally construe unclear or equivocal language in a manner to avoid acceleration." *Schuhardt Consulting Profit Sharing Plan*, 468 S.W.3d at 571; *Mastin v. Mastin*, 70 S.W.3d 148, 154 (Tex. App.—San Antonio 2001, no pet.) ("Acceleration is a harsh remedy with draconian consequences for the debtor and Texas courts look with disfavor upon the exercise of this power because great inequity may result."). The April 8 notice, like the notice at issue in *Ogden*, did not give "clear and unequivocal notice" to Senior Care that if it failed to cure the alleged defaults, BB&T "would exercise the option" to accelerate the debt automatically. *See* 640 S.W.2d at 234. Thus, BB&T's May 31 notice of acceleration was ineffective because it was not "preceded by proper notice of intent to accelerate." *See id.* We hold that the trial court's Finding Number 18 and Finding Number 29 were not supported by legally or factually sufficient evidence.

When acceleration is invalid, the plaintiff is entitled to judgment against the defendant only for past due installments plus accumulated interest as provided in the note. *Savoy*, 557 S.W.3d at 840 (quoting *Williamson*, 693 S.W.2d at 374). Here,

although Senior Care contests the trial court's findings of breach with respect to certain Events of Default, Senior Care has not contested several portions of Finding of Fact Number 19, addressing individual breaches of the Master Indenture, including:

- "Failure by Senior Care to duly and punctually pay interest on the Obligations in accordance with the terms of the Obligations and the Master Indenture, as required by Section 4.04 of the Master Indenture";

- "Failure by Senior Care to cause all Gross Revenues to be transferred from the Blocked Accounts to the Revenue Fund promptly as required by Section 3.01(d) of the Master Indenture";

- "Senior Care['s] impermissible transfers [of cash] to an Affiliate, in violation of Section 2.3.5 of Schedule 4.26 (labelled therein as "Schedule 6") to the Master Indenture"; and

- "Failure by Senior Care to deposit amounts into the Insurance and Tax Escrow Fund sufficient to pay in a timely manner all required tax payments, as required by Section 3.05 of the Master Indenture."

Although we may suggest a remittitur when there is insufficient evidence to support the full accelerated amount of damages awarded but sufficient evidence to support a lesser award, *see id.* (citing *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Rsch. Corp.*, 299 S.W.3d 106, 124 (Tex. 2009), and TEX. R. APP. P. 46.3), here no party has suggested an amount for a remittitur, Senior Care has not challenged all breaches found by the trial court, and the trial court made no findings that would identify an appropriate lesser amount of damages. Under these

67

circumstances, we reverse the award of damages in favor of Preston Hollow and remand for a new trial on Preston Hollow's breach of contract claim.[23]

We sustain Senior Care's fourth issue in part and Bouldin's third issue in part.

## Dismissal of Claims Under Rule 166

In its sixth issue, Senior Care argues that the trial court erred by dismissing its claims for conversion and money had and received via a Rule 166 pretrial-management order.

Rule of Civil Procedure 166 provides that the trial court "may in its discretion" direct the parties to appear before it for a pretrial conference to consider, among other things, "[t]he identification of legal matters to be ruled on or decided by the court." TEX. R. CIV. P. 166(g). The court "shall make an order that recites the action taken at the pretrial conference . . . and which limits the issues for trial to those not disposed of by admissions, agreements of counsel, or rulings of the court." TEX. R. CIV. P. 166. The purpose of this conference is to "assist in the disposition of the case without undue expense or burden to the parties." *Id.*

---

[23] Because we are remanding for a new trial on Preston Hollow's breach of contract claim, we need not address Senior Care's third issue, the remainder of Senior Care's fourth issue, and the remainder of Bouldin's third issue, all of which concern either their liability under the Notes or the amount of the damages award. *See* TEX. R. APP. P. 44.1(b) (providing that if reversible error affects part, but not all, of matter in controversy, appellate court must reverse judgment and order new trial "only as to the part affected by the error," but appellate court "may not order a separate trial solely on unliquidated damages if liability is contested").

Rule 166(g) thus "authorizes trial courts to decide matters that, though ordinarily fact questions, have become questions of law because 'reasonable minds cannot differ on the outcome.'" *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (quoting *Walden v. Affiliated Comput. Servs., Inc.*, 97 S.W.3d 303, 322 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)). When a Rule 166(g) order disposes of claims in this fashion, the order is akin to a summary judgment order, and we review the order de novo. *Id.* If the non-movant has raised a fact issue on the claim, dismissal under Rule 166(g) is not proper. *See McCreight v. City of Cleburne*, 940 S.W.2d 285, 288 (Tex. App.—Waco 1997, writ denied); *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (stating that more than scintilla of evidence exists to raise fact issue when evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions").

Preston Hollow, UMB Bank, and TMI moved for dismissal of Senior Care's claims for conversion and money had and received under Rule 166(g), contending that no fact issue existed on the claims and the trial court could dispose of the claims as a matter of law. Specifically, Preston Hollow, UMB Bank, and TMI argued that the claims could be dismissed as a matter of law because (1) UMB Bank and TMI were properly appointed as co-successor Bond Trustees under the Bond Indenture and therefore could exercise control over funds held by the trustee; (2) the Bond

69

Indenture provided that the funds were held in trust for the benefit of the bondholders, and therefore the funds did not belong to Senior Care; (3) Preston Hollow was expressly entitled to approve or disapprove of disbursement requests for funds held by the trustee; and (4) the claims were barred by the economic loss rule.

Conversion is the unauthorized and unlawful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights. *Cypress Creek EMS v. Dolcefino*, 548 S.W.3d 673, 684 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). The elements of a conversion claim are: (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Id.* The plaintiff must also prove damages that are the proximate result of the defendant's conversion. *Id.* at 685.

Money had and received is an equitable cause of action that "belongs conceptually to the doctrine of unjust enrichment." *Ferrara*, 555 S.W.3d at 244 (quoting *Edwards v. Mid-Continent Off. Distribs., L.P.*, 252 S.W.3d 833, 837 (Tex. App.—Dallas 2008, pet. denied)). "This cause of action is not premised on wrongdoing, but instead seeks to restore money where equity and good conscience

require restitution." *Id.* (quotations omitted); *Nivens v. City of League City*, 245 S.W.3d 470, 474 n.2 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). To be entitled to relief, the plaintiff must demonstrate that the defendant "holds money which in equity and good conscience belongs to him." *Ferrara*, 555 S.W.3d at 244 (quotations omitted).

Senior Care's claims for conversion and money had and received have an element in common: they both require Senior Care to prove that the money that has been converted or held belongs to it. Senior Care, however, cannot do so. The "Granting Clauses" of the Master Indenture provide that, to secure the payment of the outstanding obligations, Senior Care as the Obligor "does hereby grant, bargain, sell, alienate, remise, release, convey, assign, transfer, mortgage, hypothecate, pledge, set over, and confirm to the Master Trustee" several described properties including: (1) all revenue, accounts, accounts receivable, and gross revenues; (2) the real property with improvements; and (3) "[a]ny amounts on deposit from time to time in any fund or account created hereunder, subject to the provisions of this Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein." Senior Care granted this property—known under the Master Indenture as "the Trust Estate"—to BB&T as Master Trustee "TO HAVE

AND TO HOLD, IN TRUST, WITH THE POWER OF SALE . . . ."[24] The Master Indenture later states that "Trust Estate" "has the meaning given to such term in the Granting Clauses hereof." Senior Care also agreed that "as security for repayment of the Obligations, all deposit accounts of the Obligor shall at all times be controlled by the Master Trustee."

Because Senior Care has not established in the trial court or on appeal that (1) it owned or had possession of the funds or entitlement to possession, or (2) the defendants held money that belonged to Senior Care, it did not raise a fact issue on its claims for conversion and money had and received. *See Cypress Creek EMS*, 548 S.W.3d at 684 (stating elements of conversion); *Ferrara*, 555 S.W.3d at 244 (stating elements of money had and received). Thus, because Senior Care did not raise a fact issue on an essential element of these claims, the trial court properly dismissed the claims for conversion and money had and received via a Rule 166(g) pretrial management order. *See* TEX. R. CIV. P. 166(g); *JPMorgan Chase Bank*, 546 S.W.3d

---

[24] The Bond Indenture likewise provides that the Bond Trustee holds the bond proceeds in trust for the bondholders. Section 501 states: "All money deposited with or paid to the Bond Trustee for the funds and accounts held under this Bond Indenture shall be held by the Bond Trustee in trust and shall be applied only in accordance with the provisions of this Bond Indenture, and, until used or applied as herein provided, shall constitute part of the Trust Estate and be subject to the lien, terms and provisions hereof . . . ." Section 516 states: "All moneys required to be deposited with or paid to the Bond Trustee for the account of any of the funds or accounts created by this Bond Indenture shall be held by the Bond Trustee in trust . . . ." Both the Bond Indenture and the Master Indenture set out detailed requirements for specific deposit accounts and uses for the bond proceeds.

at 653 (stating that Rule 166(g) "authorizes trial courts to decide matters that, though ordinarily fact questions, have become questions of law because reasonable minds cannot differ on the outcome") (quotations omitted).

We overrule Senior Care's sixth issue.

### Attorney's Fees

Finally, in his fifth issue, Bouldin argues that the trial court erred by ordering him (jointly and severally with Senior Care) to pay the attorney's fees of Preston Hollow, UMB Bank, and TMI. In his fourth issue, Bouldin argues that neither UMB Bank nor TMI can recover on the claims that they "conditionally asserted" against him because the trial court rendered judgment solely in favor of Preston Hollow and denied all other claims. We address these issues together.

In the final judgment, the trial court awarded Preston Hollow, UMB Bank, and TMI "judgment against each of Senior Care and Bouldin, jointly and severally, in the amount of $250,000 for unpaid attorneys' fees and litigation expenses through proceedings in this Court." The court also ordered Bouldin and Senior Care, jointly and severally, to pay $520,000 in conditional appellate attorney's fees.

In its findings of fact and conclusions of law, the trial court identified several provisions of the Master Indenture, the Bond Indenture, and the Loan Agreement that allowed the Master Trustee, the Bond Trustee, the Noteholder Representative, and the Series 2017A Majority Representative to recover reasonable expenses and

73

attorney's fees from Senior Care. The court concluded that Bouldin is liable for attorney's fees and expenses under two provisions of the Guaranty, including the provision making him liable for all amounts for which Senior Care is liable. The court further concluded that Preston Hollow, UMB Bank, and TMI are entitled to their reasonable attorney's fees and expenses under both the Declaratory Judgments Act ("DJA") and Civil Practice and Remedies Code Chapter 38 because "Senior Care and Bouldin have breached their contractual obligations to pay the amounts owed." The trial court did not award a specific amount of attorney's fees for recovery under the DJA or for recovery on the breach of contract claim.

In addition to guaranteeing to the "Guaranteed Parties" the "full, complete and prompt payment of the principal and redemption price, if any, of and interest on the Series 2017 Notes when due," Bouldin also guaranteed payment of "any other sums incurred by Guaranteed Parties in enforcing this Guaranty and repayment of the Series 2017 Notes" upon the occurrence of certain specified events. Bouldin also agreed: "To the extent that the Guaranteed Parties incur any costs or expenses in protecting or enforcing its rights under this Guaranty, including reasonable attorneys' fees and the costs and expenses of litigation, such costs and expenses will be due on demand, [and] will be included in the Guaranteed Obligations." The Guaranty—and the Completion Guaranty, which did not form part of the basis for

74

the trial court's attorney's fees award—is the only document that Bouldin signed in his individual capacity.

We have already concluded that Preston Hollow is not a "Guaranteed Party" under the Guaranty, and it may not enforce the Guaranty. Therefore, the Guaranty cannot be used to justify requiring Bouldin to pay Preston Hollow's attorney's fees and expenses.

Additionally, as Bouldin argues in his fourth issue, UMB Bank and TMI "conditionally asserted" the same causes of action asserted by Preston Hollow—including a claim that Bouldin is liable under the Guaranty—in the event the court determined that Preston Hollow's authority to bring suit was limited. In the final judgment, however, the trial court awarded damages against Bouldin under the Guaranty only to Preston Hollow. The condition to trigger assertion of UMB Bank and TMI's claims—the trial court's determination that Preston Hollow lacked authority to sue Senior Care—therefore never occurred. Aside from incorporating its earlier summary judgment ruling that UMB Bank and TMI were properly appointed as co-successor Master Trustee and Bond Trustee and awarding attorney's fees and expenses, the court did not award relief to UMB Bank or TMI in the final judgment. In the final paragraph of the judgment, the trial court ordered that "all other claims and causes of action are denied."

"A party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal." TEX. R. APP. P. 25.1(c). We "may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause." *Id.* Neither UMB Bank nor TMI filed a notice of appeal from the trial court's judgment. We therefore cannot grant them greater relief than the trial court granted them. The trial court did not grant UMB Bank or TMI judgment on their conditional claims against Bouldin and instead expressly denied "all other claims and causes of action." In the absence of a notice of appeal from UMB Bank or TMI seeking to alter this portion of the trial court's judgment, we may not grant them relief on their conditional claims against Bouldin.[25]

Without a judgment in their favor that Bouldin is liable to them under the Guaranty, at this point, UMB Bank and TMI cannot recover attorney's fees against

---

[25] We agree with Bouldin that this is not a situation in which a party prevailed in the trial court and had a judgment in its favor reversed on appeal, entitling the party to elect a lesser remedy under an alternative theory of recovery. *See Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988) ("When the jury returns favorable findings on two or more alternative theories, the prevailing party need not formally waive the alternative findings. That party may seek recovery under an alternative theory if the judgment is reversed on appeal."). Aside from the trial court's declaratory judgment on the issue of appointment as successor Master Trustee and Bond Trustee and the court's ruling on attorney's fees, the trial court did not grant relief in favor of UMB Bank and TMI. UMB Bank and TMI did not prevail on their conditional claims; instead, the condition to trigger these claims never occurred.

Bouldin under the Guaranty. We therefore hold that the trial court erred by ordering

Bouldin to pay attorney's fees to Preston Hollow, UMB Bank, and TMI.[26]

We sustain Bouldin's fourth issue in part and his fifth issue.

---

[26] Similarly, because we reverse the judgment of the trial court on Preston Hollow's breach of contract claim and remand that claim for a new trial and because the trial court did not award a specific amount of attorney's fees for Preston Hollow's breach of contract claim and a specific amount of attorney's fees for UMB Bank and TMI's declaratory judgment claim, we vacate the portion of the judgment that awards Preston Hollow, UMB Bank, and TMI attorney's fees against Senior Care.

## Conclusion

We reverse the portion of the trial court's judgment that granted Preston Hollow judgment against Bouldin under the Guaranty and render judgment that Preston Hollow may not enforce the Guaranty against Bouldin. We also reverse the portions of the judgment that granted Preston Hollow judgment against Senior Care for breach of contract and awarded Preston Hollow $52,597,040.06 in damages and pre-judgment interest against Senior Care. We remand Preston Hollow's breach of contract claim against Senior Care for a new trial. We also remand UMB Bank and TMI's claims against Bouldin under the Guaranty for further proceedings.[27] We further vacate the award of attorney's fees in favor of Preston Hollow, UMB Bank, and TMI. We affirm the remaining portions of the trial court's judgment.



April L. Farris
Justice

Panel consists of Justices Hightower, Rivas-Molloy, and Farris.

---

[27] Because the condition to trigger UMB Bank and TMI's claims against Bouldin under the Guaranty did not occur while the underlying proceeding was pending in the trial court, these claims were not tried in the underlying trial. On appeal, however, we have determined that Preston Hollow may not enforce the Guaranty against Bouldin. We therefore remand not for a *new* trial on UMB Bank and TMI's claims against Bouldin, but for a trial in the first instance.